Delta Resources, Inc., et al., Appellants, v Gerard J. Harkin et al., Respondents.

First Department, June 24, 1986

## APPEARANCES OF COUNSEL

*John S. Martin, Jr.,* of counsel *(Aegis J. Frumento, Michele S. Hirshman* and *Howard B. Weinreich* with him on the brief; *Schulte Roth & Zabel,* attorneys), for appellants.

*John H. Steel* for respondents.

### OPINION OF THE COURT

ROSENBERGER, J.

This is an action for a permanent injunction and damages for alleged unfair competition and other commercial torts. It stems from the sale of Delta Resources, Inc., by defendant shareholders to Itel Corporation (Itel), and then again two years later by Itel to plaintiff Volt Information Services (Volt). The issue involves whether the duty of shareholder sellers of a business to refrain indefinitely from soliciting those entities which were customers of the business, at the time when they sold their interests, survives the purchaser's sale of the business to a third party. Stated differently, the issue is whether the doctrine of *Mohawk Maintenance Co. v Kessler* (52 NY2d 276 [1981]) applies to successive transfers of a business.

In 1972, defendant Gerard Harkin and another individual founded Delta Resources, Inc. (Delta), a company which designs and sells computer systems and software capable of converting telephone company customer information data bases into hard copy directories and of making available the same information for automated directory assistance. The defendant Harkin owned 20% of outstanding Delta stock and the other four defendants owned a total of 7.25%.

Delta merged into and was acquired by Itel Delta Resources, Inc. (Itel Delta), a wholly owned subsidiary of Itel on March 31, 1978. The defendants exchanged Delta stock for Itel common stock in proportion to their ownership interests in Delta. Harkin signed the "Agreement and Plan of Reorganization" as a "Principal Shareholder". He received approximately 60,500 shares of Itel stock, then worth over $1,000,000. The agreement concededly transferred good will. By its terms, the agreement was nonassignable. In connection with the sale, Harkin accepted the position of vice-president and signed a three-year employment contract. He also undertook not to compete with Itel for two years after he terminated his employment and not ever to solicit Itel's customers, with certain exceptions not here relevant.

Two years later, Itel suffered severe financial difficulties. It sold many assets, including Itel Delta, in a futile effort to stave off bankruptcy and satisfy its institutional lenders. Harkin was closely involved in the negotiations which culminated in the resale of the business to plaintiff Volt, one of its competitors. Under the rubric of "General Assets", Volt purchased all "tangible and intangible assets of Delta", excluding certain specifically identified items not here relevant.

Itel agreed not to compete with the business being sold. Harkin signed a separate three-year employment agreement and received compensation consisting not only of salary and benefits, but also of cash and Volt stock worth $466,500 and stock options to offset the precipitous loss in the market value of his Itel stock between 1978 and 1980. The contract contained an agreement not to compete with Volt, or solicit Volt customers, for one year after he terminated his employment, except that if no offer of renewal was made as of a certain date at the end of the three-year period, he would be under no restriction. The other defendants similarly received special compensation in the form of a combination of cash and Volt stock in connection with the sale. However, they were not offered contracts, and became employees at will.

As it had in 1978, the business of Delta remained at the same location and employed the same personnel. However, it was reorganized in the form of two wholly owned subsidiaries of Volt, Volt Delta Resources, Inc., and a newly incorporated entity with the resurrected name Delta Resources, Inc.

Volt concededly did not make a timely formal offer to renew Harkin's contract pursuant to its terms. Volt does not seri-

ously dispute that Harkin's noncompetition covenant has expired. In March 1985, Harkin resigned and formed his own competing business, DR TWO. Shortly thereafter, the other defendants joined DR TWO. Harkin sought the patronage of regional telephone companies which had done business with Delta, Itel Delta, and the Volt subsidiaries, including U. S. West Corp., for which he had been preparing a proposal on behalf of Volt only weeks before his departure.

The plaintiffs obtained a temporary restraining order shortly after commencing this action. Special Term granted the motion of plaintiffs Volt and its two subsidiaries for a preliminary injunction barring solicitation of business from those customers who were customers of plaintiff on June 30, 1980 for a one-year period. The court impliedly found that the one-year contractual noncompetition agreement between Harkin and Volt was binding. However, the court subsequently granted defendants' motion to vacate or modify the portion of the order which preliminarily enjoined the solicitation of customers for one year. The defendants pointed out that plaintiffs had only sought a *Mohawk* injunction, and had specifically disclaimed reliance upon the contractual agreement. Incorrectly terming the motion one for reargument, the court vacated the challenged portion of its first order, stating that it had previously determined *Mohawk Maintenance (supra)* did not apply. We granted plaintiffs' motion for a stay pending determination of the appeal from the second order. The balance of the injunction is not at issue since the defendants have agreed not to disclose confidential and proprietary information, have changed the name of the business, and have failed to perfect their appeal from the first order.

In *Mohawk Maintenance (supra)*, by a 4 to 3 decision, the Court of Appeals affirmed an order granting partial summary judgment, with a modification not relevant here, and upheld the permanent injunction which granted a purchaser an indefinite bar against the solicitation of former customers by the principal shareholder seller. The court indicated that "When the intangible asset of good will is sold along with the tangible assets of a business, the purchaser acquires the right to expect that the firm's established customers will continue to patronize the business" *(Mohawk Maintenance Co. v Kessler,* 52 NY2d 276, 285, *supra).* Thus, the court stated, the law imposes upon the seller a specific duty to refrain from soliciting former customers after he has sold his business and "the accompanying 'good will' to another." *(Mohawk Maintenance*

*Co. v Kessler, supra,* at p 286.) The court concluded that good will was transferred, although Kessler's agreement of sale did not expressly mention it, based upon the surrounding circumstances, particularly the high purchase price, $2,000,000, and the existence of an express contractual noncompetition agreement. *(See also, Hyde Park Prods. Corp. v Lerner Corp.,* 65 NY2d 316 [1985].)

We cannot agree with the conclusion of Special Term regarding the bar against solicitation for former customers. In our view, plaintiffs have a strong probability of success in qualifying for a *Mohawk* permanent injunction. The rationale underlying the common-law rule, as articulated in *Mohawk Maintenance (supra),* seems to compel extension of the rule to the present situation. We conclude that defendants should be preliminarily enjoined from soliciting those entities that were customers of the business when they sold their interests on March 31, 1978, since Itel sold the business, including its good will, to Volt.

The court in *Mohawk Maintenance (supra)* could see "no sound reason" to lift the prohibition against solicitation at any time after the transfer of a business. It stated that the "implied covenant" might well be viewed as "inherently" reasonable, notwithstanding its indefinite duration. It viewed the positive and permanent duty to refrain from soliciting former customers as somewhat misleadingly characterized as emanating from an "implied covenant" since, in reality, it was imposed by law to prevent the seller from recapturing the good will he has purported to sell. Similarly, in the present case there is no logical reason a fortuitous event, such as Itel's decision to exercise its vested right of alienability, should serve to free defendants of the obligation not to solicit customers.

The defendants' reliance upon the expiration of Harkin's covenant not to compete against plaintiffs is clearly misplaced. The majority of the court in *Mohawk Maintenance* explicitly rejected the view of the minority, which was similar to this contention, holding that a limited contractual noncompetition agreement does not supersede or alter the indefinite duration of the "implied covenant" at common law. *(Mohawk Maintenance Co. v Kessler, supra,* at pp 283-284.)

We find that good will was transferred to plaintiffs in light of the circumstances surrounding the 1980 sale. As in *Mohawk Maintenance (supra),* the seller, Itel, had executed an

business sold. It held that a limited contractual noncompetition agreement does not alter the indefinite duration of the "implied covenant" at common law. *(Mohawk Maintenance Co. v Kessler, supra,* at pp 282-284.) Indeed, the court reasoned that the existence of the noncompetition agreement was evidence that "good will" was intended to be transferred and required protection *(supra,* at p 286). In our view, it makes no difference that the noncompetition agreement extracted from the seller in *Mohawk Maintenance* expired before the Court of Appeals rendered its decision, whereas the one in the present case did not become operational because the employment agreement was not renewed. While it may be presumed that the subsequent purchaser of a business could consent to waive the protection of *Mohawk Maintenance,* such a waiver requires clearer more explicit language than that used in the noncompetition clause of the employment agreement.

We find that good will was transferred to plaintiffs in light of the circumstances surrounding the 1980 sale. As in *Mohawk Maintenance (supra),* the seller, Itel, had executed an express contractual noncompetition agreement with the purchaser, Volt. The sales agreement recited transfer of all "tangible and intangible assets of Delta" under the rubric of "General Assets" and of the use of the Delta Resources component of the business' name. The latter indicates that Volt considered customer identification and loyalty to Delta a valuable asset. Moreover, the business continued operation from the same location, with the same personnel.

As evidence that good will does not exist in this context or was not transferred in 1980, defendants rely upon the exclusion of any express reference to good will due to adverse tax consequences, use of the competitive bidding process for awarding contracts, and alleged low customer loyalty due to the "state of the art" nature of the computer systems design industry. However, these factors are neither dispositive nor persuasive. The defendants' use of the name "DR TWO", until enjoined therefrom, belies their contention and indicates that good will is involved in this type of business. Further, defendants have not demonstrated that the seven regional telephone companies purchase specialized computer services on such a large scale that good will can be eliminated as to them. *(Cf. Hyde Park Prods. Corp. v Lerner Corp., supra.)* The evidence in the record, particularly the submission of competing bids to U.S. West Direct, strongly suggests that the respective parties compete directly and indirectly in the same markets,

Harkin's close involvement in resale negotiations was natural because of his interest in having the business acquired by a compatible company and the interest of any prospective purchaser in retaining him. Key employees, as distinct from the sellers of a business, are not subject to an "implied covenant" not to solicit former customers.

The defendants' contentions as to lack of identifiable damages, and a balancing of equities are without merit. Only AT&T and three of the regional telephone companies were customers of the business in 1978. Since the divestiture of AT&T in 1982, four other regional companies have come into existence. Thus, the preliminary injunction does not threaten the defendants' livelihood.

■ The plaintiffs did not perfect their appeal from the first order at Special Term. We would extend the injunction beyond one year, but the issue is not before us. This is not the exceptional case where modification of the order being reviewed necessarily entails granting affirmative relief to the nonappealing party. *(Hecht v City of New York,* 60 NY2d 57, 61-63 [1983].) However, our order is without prejudice to plaintiffs' rights to seek an extension of the injunction at Special Term.

Accordingly, the order, Supreme Court, New York County (Helen E. Freedman, J.), entered on November 12, 1985, which, *inter alia,* granted defendants' motion pursuant to CPLR 6314 to modify or vacate the second decretal paragraph of the order of the same court entered on July 5, 1985, enjoining defendants for one year from soliciting business from any customer who had been a customer of plaintiffs on June 30, 1980, should be modified, on the law, to reinstate the second decretal paragraph and to modify said paragraph so as to enjoin defendants from soliciting those entities which were customers of the business on March 31, 1978, and, as so modified, it should otherwise be affirmed, without prejudice to an application for an extension of the injunction at Special Term, without costs.

SULLIVAN, J. P., CARRO and ELLERIN, JJ., concur.

Order, Supreme Court, New York County, entered on November 12, 1985, unanimously modified, on the law, to reinstate the second decretal paragraph of an order of said court entered on July 5, 1985, and to modify said paragraph so as to enjoin defendants from soliciting those entities which were customers of the business on March 31, 1978, and, as so

modified, otherwise affirmed, without prejudice to an application for an extension of the injunction at Special Term, without costs and without disbursements.