[949 NE2d 462, 925 NYS2d 371]

BESSEMER TRUST COMPANY, N.A., Respondent, v FRANCIS S. BRANIN, JR., Appellant.

Argued March 21, 2011; decided April 28, 2011

**POINTS OF COUNSEL**

*Bond, Schoeneck & King, PLLC*, New York City (*Louis P. DiLorenzo, Michael I. Bernstein* and *Michael P. Collins* of

counsel), for appellant. I. The District Court drew its own line in contravention of the *Mohawk* doctrine. (*Mohawk Maintenance Co. v Kessler*, 52 NY2d 276; *Von Bremen v MacMonnies*, 200 NY 41.) II. A meaningful approach must take into account the dictates of the *Mohawk* doctrine as clarified by this Court. (*Mohawk Maintenance Co. v Kessler*, 52 NY2d 276; *Von Bremen v MacMonnies*, 200 NY 41; *SEC v Capital Gains Research Bureau, Inc.*, 375 US 180; *Tactica Intl., Inc. v Atlantic Horizon Intl., Inc.*, 154 F Supp 2d 586; *Graubard Mollen Dannett & Horowitz v Moskovitz*, 86 NY2d 112.)

*Chadbourne & Parke LLP*, New York City (*Donald I. Strauber, Mary T. Yelenick* and *Marcello M. Blackburn* of counsel), for respondent. I. The District Court correctly held that Francis S. Branin, Jr. violated New York law when he caused the Palmer family accounts to move to Stein Roe Investment Counsel LLC. (*Mohawk Maintenance Co. v Kessler*, 52 NY2d 276; *Von Bremen v MacMonnies*, 200 NY 41; *Hyde Park Prods. Corp. v Lerner Corp.*, 65 NY2d 316; *Borne Chem. Co. v Dictrow*, 85 AD2d 646; *Delta Resources v Harkin*, 118 AD2d 133; *Brasscrafters, Inc. v Ehrlich*, 109 AD2d 724.) II. The District Court's interpretation of *Mohawk Maintenance Co. v Kessler* (52 NY2d 276 [1981]) is sound as a matter of New York law and public policy. (*Von Bremen v MacMonnies*, 200 NY 41; *511 W. 232nd Owners Corp. v Jennifer Realty Co.*, 98 NY2d 144; *Matter of Co-operative Law Co.*, 198 NY 479.)

### OPINION OF THE COURT

CIPARICK, J.

The United States Court of Appeals for the Second Circuit has certified the following question for our consideration: "What degree of participation in a new employer's solicitation of a former employer's client by a voluntary seller of that client's good will constitutes improper solicitation?" (*Bessemer Trust Co., N.A. v Branin*, 618 F3d 76, 94 [2d Cir 2010].)

Specifically, the Second Circuit seeks our guidance on whether the following two sets of actions, taken together, make out "improper solicitation" under New York law:

> "(1) the active development and participation by the seller, in response to inquiries from a former client whose good will the seller has voluntarily sold to a third party, in a plan whereby others at the

seller's new company solicit a client, and (2) participation by the seller in solicitation meetings where the seller's role is largely passive." (*Id.*)

## I.

Plaintiff Bessemer Trust Company, N.A. (Bessemer) is a privately owned wealth management and investment advisory firm headquartered in New York City. Founded in 1907, Bessemer provides services to high net worth individuals, families, and institutional clients. Defendant Francis S. Branin, Jr. is an investment portfolio manager. In 1977, Branin joined the New York City based investment management firm Brundage, Story & Rose, LLC (Brundage) where he too advised high net worth clients. Branin became a principal at Brundage in 1982 and served as its chief executive officer from 1996 through October 2000.

By purchase agreement dated August 18, 2000 (the Purchase Agreement), the shareholders of Brundage agreed to sell the assets of their firm, including Brundage's client accounts and related good will, to Bessemer for more than $75 million. Bessemer acquired these assets in October 2000 and Branin, along with the seven other Brundage principals, began to work at Bessemer at that time.

The Purchase Agreement imposed no express restrictive covenants on the Brundage principals. They were at-will employees of Bessemer with no ownership interest in the newly formed firm. The Purchase Agreement further provided that only $50 million of the purchase price was payable up front. Branin, the largest Brundage shareholder, received more than $9.1 million of this amount. The remainder of the purchase price was conditional. If the Brundage principals were able to achieve certain thresholds related to client retention, revenue enhancement, and reduction of expenses, they were eligible to receive the remainder of the purchase price in four subsequent installments. In September 2001 and in April 2002, the Brundage principals, having met designated benchmarks, qualified for the first two contingency payments. In total, Branin received over $15 million for the sale of his interest in Brundage between October 2000 and April 2002. Branin and the rest of the Brundage principals were ineligible for the remaining two contingency payments.

Branin soon became unhappy with his role at Bessemer. He disliked the fact that Bessemer management had reduced his

responsibilities and excluded him from key management meetings. As a result, Branin started to explore different opportunities. To that end, from November 2001 to June 2002, Branin periodically met with William Rankin, the president and chief executive officer of Stein Roe Investment Counsel LLC (Stein Roe), a wealth management firm, to discuss the possibility of his employment. The two discussed Branin's desired level of compensation and how such compensation would be structured. Rankin was aware that Bessemer had recently acquired Brundage and understood from these conversations that if Branin were to join Stein Roe, he could not actively solicit his clients to transfer their accounts from Bessemer to Stein Roe.

By late May or early June, Branin had made the decision to join Stein Roe. On July 12, 2002—less than two years after Bessemer acquired Brundage—Branin resigned from Bessemer. Ten days later, by letter dated July 22, 2002, Stein Roe formally offered Branin the position of senior vice-president and principal. Branin commenced his employment with Stein Roe on July 29, 2002.

Branin did not notify his existing clients about his decision to resign from Bessemer and join Stein Roe. Bessemer instructed Branin to prepare a list of his clients with the pertinent account holder information so that Bessemer could transition these accounts to other investment advisors at the firm. Branin complied with this directive. Shortly after reviewing the list of Branin's accounts, Bessemer mailed letters to Branin's clients, informing them that Branin was "leaving Bessemer to pursue other career opportunities."

Once Branin joined Stein Roe, some of his former Bessemer clients contacted him. Many of these clients asked Branin why he had left Bessemer. Branin's standard response to these inquiries was "a firm like Stein Roe was far more appropriate for me, . . . that the method of dealing with clients, that the approach whereby portfolio managers managed the client portfolios and interacted directly with the clients was more . . . appropriate for my training and experience of 30 years in the business."

Several of Branin's clients elected to transfer their accounts to Stein Roe in the ensuing months. As relevant to this appeal, the Palmer family, Branin's largest client at Bessemer, were among those who had followed Branin to Stein Roe. The Palmer family first developed a relationship with Branin at Brundage

in the 1980s, where Branin served as the junior investment advisor on the account. Eventually, Branin was elevated to lead advisor on the account and he and the head of the Palmer family, Carleton Palmer III (Palmer), had become friends. Despite this friendship, Branin refrained from informing Palmer of his decision to work at Stein Roe. The Palmer family first learned that Branin had left Bessemer when Paul Barkus, a Bessemer employee, telephoned Palmer's brother. Indeed, Barkus specifically advised Palmer's brother that Branin was not permitted to contact them; Barkus informed Palmer's brother that Branin had accepted an offer with a different firm, but did not disclose that it was Stein Roe.

The news that Branin was no longer with Bessemer alarmed the Palmer family. Although Palmer knew Barkus, his primary and virtually exclusive contact at Bessemer was Branin. Palmer immediately called Branin at his home. During this conversation, Branin disclosed that he had joined Stein Roe and, on the advice of counsel, was told not to solicit his Bessemer clients. At the conclusion of the telephone call, Palmer indicated that his family would need time to consider their options and hinted that they "would more than likely solicit or investigate both firms," meaning Stein Roe and Bessemer.

As a follow-up, Palmer sent Branin a letter, dated July 31, 2002, seeking to organize a "preliminary meeting" in order to discuss how their accounts "would be handled within your new organization." Palmer also sought information on "the background of the organization and the continuity of account management that could be provided." The Palmer family and Stein Roe agreed to meet in New York on August 29, 2002. The Palmer family similarly arranged a meeting with Bessemer on the same day.

Once Branin received Palmer's letter, he requested president Rankin's guidance in determining who should represent Stein Roe in the upcoming meeting with the Palmer family. Rankin referred Branin to the appropriate personnel and Branin facilitated a strategy session with them one week prior to Stein Roe's presentation to the Palmers. During this session, Branin described the Palmer family's investment philosophy and other background information related to this long-standing client. On the day of the Stein Roe meeting, Branin was present. He introduced the Palmer family to Rankin and the other participating Stein Roe executives. From there, Palmer conducted the

meeting, directing questions toward the Stein Roe representatives. Branin essentially played no role in this meeting and would only "occasionally amplify a point" that the others were making. Palmer did not inquire about the fee structure at Stein Roe.

After his meetings with both Stein Roe and Bessemer, Palmer's instinct was to transfer the family's accounts to Stein Roe. Since Palmer's first meeting with Stein Roe, however, was introductory in nature, Palmer wanted a formal proposal from Branin. Palmer invited Branin to his home state of Ohio to discuss the specifics. Branin obliged and traveled to Ohio on September 16, 2002. Branin explained that he would be the lead investment advisor on the account and that Stein Roe's president would serve as the backup advisor to the account. Branin also confirmed that Stein Roe would charge the same fees that Bessemer was currently charging the Palmer family. The following day, the Palmer family moved their accounts to Stein Roe.

On November 22, 2002, after a number of Branin's clients left Bessemer for Stein Roe, Bessemer commenced this action in Supreme Court. Bessemer, in relevant part, alleged that Branin had breached his duty of loyalty to Bessemer under the theory that Branin improperly solicited his former clients to join him at Stein Roe, thereby impairing the good will that Branin had sold to Bessemer in connection with Bessemer's acquisition of Brundage. Branin removed the case to federal District Court on diversity grounds and filed a number of counterclaims.

Once the parties completed pretrial discovery, they each brought a motion for summary judgment. The United States District Court for the Southern District of New York denied the motions. With the consent of the parties, District Court conducted a bench trial solely as to Branin's liability on Bessemer's claims. By order dated April 10, 2006, District Court found that Branin "improperly induced the Palmer account to leave Bessemer and that this inducement in fact caused the Palmer account to leave Bessemer and join Stein Roe" in violation of New York law (*Bessemer Trust Co., N.A. v Branin*, 427 F Supp 2d 386, 393 [SD NY 2006]). With respect to the other accounts that transferred from Bessemer to Stein Roe, however, District Court found that Bessemer did not meet its burden of proving that Branin had violated New York law (*see id.*).

Following the bench trial on the question of liability, Bessemer moved for summary judgment on Branin's counterclaims,

which District Court granted (*Bessemer Trust Co., N.A. v Branin*, 498 F Supp 2d 632 [SD NY 2007]). Thereafter, the parties proceeded to trial on the issue of damages. District Court conducted a second bench trial and awarded Bessemer over $1.2 million in damages and prejudgment interest (*see Bessemer Trust Co., N.A. v Branin*, 544 F Supp 2d 385, 393 [SD NY 2008]).

The parties appealed to the United States Court of Appeals for the Second Circuit. As relevant to the issue before us, Branin appealed District Court's liability determination with respect to the Palmer account.[1] As noted earlier, the Second Circuit certified a question to our Court, seeking guidance "in determining what actions [under New York law] constitute improper solicitation" (*Bessemer Trust Co.*, 618 F3d at 87 [internal quotation marks omitted]).

## II.

■ Under New York common law, a seller has an "implied covenant" or "duty to refrain from soliciting former customers, which arises upon the sale of the 'good will' of an established business" (*Mohawk Maintenance Co. v Kessler*, 52 NY2d 276, 283 [1981]). We first adopted this rule, which derives from English common law, in *Von Bremen v MacMonnies* (200 NY 41 [1910]). The rationale underlying the rule is that

> " '[a] man may not derogate from his own grant; the vendor is not at liberty to destroy or depreciate the thing which he has sold; there is an implied covenant, on the sale of good will, that the vendor does not solicit the custom which he has parted with; it would be a fraud on the contract to do so. . . . It is not right to profess and to purport to sell that which you do not mean the purchaser to have; it is not an honest thing to pocket the price and then to recapture the subject of sale; to decoy it away or call it back before the purchaser has had time to attach it to himself and make it his very own' " (*Von Bremen*, 200 NY at 50-51, quoting *Trego v Hunt*, [1896] AC 7, 25; *see also Mohawk*, 52 NY2d at 286; *Bessemer Trust Co.*, 618 F3d at 86).

---

1. Branin also appealed District Court's award of damages and the court's dismissal of his counterclaims against Bessemer. Bessemer appealed District Court's calculation of damages. In light of its certified question to our Court, the Second Circuit reserved its decision on District Court's award of damages (*see Bessemer Trust Co.*, 618 F3d at 91). It affirmed District Court's dismissal of Branin's counterclaims against Bessemer (*see id.* at 91-93).

A seller's "implied covenant" not to solicit his former customers is "a permanent one that is not subject to divestiture upon the passage of a reasonable period of time" (*Mohawk*, 52 NY2d at 285). Indeed, we have recognized that upon the sale of "good will," a "purchaser acquires the right to expect that the firm's established customers will continue to patronize the business" (*id.*, citing *People ex rel. Johnson Co. v Roberts*, 159 NY 70, 80-84 [1899]). This is so because "[t]he essence of [these types of] transaction[s] is, in effect, an attempt to transfer the loyalties of the business' customers from the seller, who cultivated and created them, to the new proprietor" (*id.*).

Notwithstanding this "implied covenant," a buyer assumes certain risks when he purchases an existing business and attempts to transfer the loyalties or "good will" of that business as his own. For example, the customers of the acquired business, "as a consequence of the change in ownership," may choose to take their patronage elsewhere (*id.*). Indeed, "the occurrence of a certain amount of attrition is one of the risks that the purchaser must assume when he acquires an established business" (*id.*). Moreover, the seller of a business is free to subsequently compete with the purchaser and even "accept[ ] the trade of his former customers, provided that he does not *actively* solicit such trade" (*id.* at 285 n 6 [emphasis added]). To militate against these risks, which extend beyond the limited scope of a seller's "implied covenant," a purchaser is free to negotiate an express covenant, reasonably restricting, for instance, a "seller's right to compete in a particular geographical area or field of endeavor" (*id.* at 284).

There is no hard and fast rule in determining whether a seller of "good will" has improperly solicited his former clients, and we decline to create one here. Rather, in making this assessment on a case-by-case basis, the trier of fact must consider the principles underlying the rule in *Mohawk* and the factors involved within the relevant industry that may impair the "good will" conveyed by the original seller.

A trier of fact ought to consider whether, following the sale of a business and its good will, a seller initiated contact with his former customers or clients. Such initiation is particularly relevant where a seller, like Branin, remains in the industry. On this point, Branin has conceded that such contact would impair the "good will" acquired by a bona fide purchaser. We agree. The "implied covenant" not to solicit former customers bars a seller from taking affirmative steps to directly communicate

with them (*see e.g. Hyde Park Prods. Corp. v Lerner Corp.*, 65 NY2d 316, 321 [1985] [deliberate solicitation of seller's former customers "breached the duty against impairment of the goodwill transferred as part of the sale of the business"]). A seller may not, for example, send targeted mailings or make individualized telephone calls to his former customers informing them of his new business ventures. These examples are illustrative, not exhaustive, of the types of purposeful communications with former customers that the "implied covenant" proscribes. On the other hand, absent an express or restrictive covenant not to compete, a seller of "good will" who lawfully competes with a purchaser may advertise to the public. So long as such advertisement is general in nature—and not specifically aimed at the seller's former customers—it is permissible under New York law.

A seller, of course, is not free to tout his new business venture simply because a former client has fortuitously communicated with him first. Such a rule would contravene our holdings in *Von Bremen* and *Mohawk* and lead to inconsistent results. Nonetheless, not all discussions between a seller and former client are impermissible. While the "implied covenant" places certain barriers on a seller's conduct, it in no way prohibits a former customer or client from gathering information about that seller. In the free market, consumers of goods and services have the right to make informed choices.[2] The issue we must resolve is to what extent a seller of "good will" may respond to the various inquiries of a former client.

In the context of the financial services industry, as in this case, a former client, contemplating the transfer of his business from the purchaser back to the seller, will invariably conduct due diligence and seek factual information pertaining to topics such as investment strategy, resources available to the seller, personnel, and fee structure. Given the competitive nature and the complexity of the financial services sector, these types of questions are entirely appropriate and, indeed, expected, especially in a case such as this where the Palmer family placed a great deal of personal trust in Branin (*see generally SEC v Capital Gains Research Bureau, Inc.*, 375 US 180, 189-190 [1963]). Thus, a seller of "good will" may answer the factual

---

2. Indeed, it has been observed that "the public interest is better served with open competition in the securities field and access to advisors of clients' choice" (*Smith Barney v Burrow*, 558 F Supp 2d 1066, 1084 [ED Cal 2008]).

inquiries of a former client, so long as such responses do not go beyond the scope of the specific information sought.

Nevertheless, the "implied covenant" places some limitations on a seller's right to answer all the questions posed by a former client. A seller of "good will" engages in improper solicitation when, even if prompted, he disparages the purchaser of his business. In relinquishing the "good will" of his business to a purchaser, a seller loses his right to explain, for example, why he believes his products or services are superior. This rule comports with the purpose of the "implied covenant," which precludes a seller from "destroy[ing] or depreciat[ing] the thing which he has sold" (*Von Bremen*, 200 NY at 51 [internal quotation marks omitted]).

Our discussion applies with equal force to the seller of "good will" who subsequently establishes a new business as a solo practitioner or joins a competing firm (*see Bessemer Trust Co.*, 618 F3d at 89 n 5). In this case, Branin opted to join Stein Roe, a firm that competes with Bessemer. The issue in which the Second Circuit seeks our guidance is to what degree a seller may assist his new employer in responding to inquiries made by a former client. Since the seller of "good will," absent a restrictive covenant, may compete with a purchaser, we conclude that certain activity within a new employer's firm must be permissible.

A seller of "good will," for example, is free to convey certain information about his former client to his new employer. In the context of the financial services industry, appropriate topics may include items such as a former client's investment preferences, financial goals, and tolerance of risk; it may not include information that is proprietary to a purchaser of "good will." A seller may also aid his new employer in preparing for a "sales pitch" meeting requested by a former client and may be present when such meeting takes place, although the "implied covenant" imposes some restrictions on the seller's level of involvement during such a meeting. So long as a seller's role is limited to responses to factual matters, his participation in such a meeting will not violate the "implied covenant."

In answering the certified question, we continue to apply our precedents in *Von Bremen* and *Mohawk* and hold that the "implied covenant" bars a seller of "good will" from improperly soliciting his former clients. We conclude that, while a seller may not contact his former clients directly, he may, "in response

to inquiries" made on a former client's own initiative, answer factual questions. Furthermore, under the circumstances where a client exercising due diligence requests further information, a seller may assist his new employer in the "active development . . . [of] a plan" to respond to that client's inquiries. Should that plan result in a meeting with a client, a seller's "largely passive" role at such meeting does not constitute improper solicitation in violation of the "implied covenant." As such, a seller or his new employer may then accept the trade of a former client.

Accordingly, the certified question should be answered in accordance with this opinion.

Chief Judge LIPPMAN and Judges GRAFFEO, READ, SMITH, PIGOTT and JONES concur.

Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.27 of the Rules of Practice of the New York State Court of Appeals (22 NYCRR 500.27), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question answered in accordance with the opinion herein.