# United States Court of Appeals
## For the First Circuit

No. 13-1706

CORPORATE TECHNOLOGIES, INC.,

Plaintiff, Appellee,

v.

BRIAN HARNETT; ONX USA LLC, d/b/a ONX ENTERPRISE SOLUTIONS,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Howard, Selya and Lipez,

Circuit Judges.

Michele A. Whitham, with whom Christopher Hart, Elizabeth M. Holland, and Foley Hoag LLP were on brief, for appellants.
Kevin J. O'Connor, with whom Kelley A. Jordan-Price, Mark A. Bross, and Hinckley, Allen & Snyder, LLP were on brief, for appellee.

August 23, 2013

**SELYA, Circuit Judge.** Businesses commonly try to protect their good will by asking key employees to sign agreements that prohibit them from soliciting existing customers for a reasonable period of time after joining a rival firm. When a valid non-solicitation covenant is in place and an employee departs for greener pastures, the employer ordinarily has the right to enforce the covenant according to its tenor. That right cannot be thwarted by easy evasions, such as piquing customers' curiosity and inciting them to make the initial contact with the employee's new firm. As we shall explain, this is such a case.

## I. BACKGROUND

This is an interlocutory appeal growing out of a business dispute. Below, the district court granted a preliminary injunction that restrained defendant-appellant Brian Harnett, a former employee of plaintiff-appellee Corporate Technologies, Inc. (CTI), from doing business with certain customers to whom he had sold products and services while in CTI's employ. The preliminary injunction extended to other matters as well; for example, it included an order that defendant-appellant OnX USA LLC (OnX), a competitor of CTI and Harnett's current employer, withdraw certain bids on which Harnett had toiled.

The defendants appeal from the issuance of the preliminary injunction. After careful consideration, we affirm.

The pertinent facts are catalogued in the district court's rescript, see CTI v. Harnett (CTI I), No. 12-12385, 2013 WL 1891308, at *1-2 (D. Mass. May 3, 2013), and we assume the reader's

familiarity with that account.  For present purposes, a sketch of the origin and travel of the case will suffice.

For nearly a decade, Harnett worked as an account executive/salesman at CTI, a provider of customized information technology solutions to sophisticated customers.  Because CTI regards many of the details of its business operations as proprietary, it insisted that Harnett sign an agreement (the Agreement) that contained non-solicitation and non-disclosure provisions when he came on board.  Harnett obliged.

In October of 2012, Harnett jumped ship to work for OnX. The record makes manifest that, following his departure from CTI, Harnett participated in sales-related communications and activities with certain of his former CTI customers on behalf of OnX.

CTI was not pleased.  It lost little time in repairing to a Massachusetts state court, where it alleged that Harnett's actions transgressed the Agreement and that OnX's encouragement of those actions constituted tortious interference with CTI's contractual rights and advantageous relationships.  CTI's suit sought both money damages and injunctive relief.

The defendants removed the case to the United States District Court for the District of Massachusetts based on diversity of citizenship and the existence of a controversy in the requisite amount.  See 28 U.S.C. §§ 1332(a), 1441(a).  When they answered the complaint, the defendants denied that they had committed either a breach of contract or a tort.  Harnett also interposed a counterclaim (immaterial to the issues on appeal).

-3-

CTI sought a preliminary injunction based on affidavits, deposition testimony, and documentary proffers. The defendants opposed the motion, submitting evidence of their own. In due course, the district court granted a preliminary injunction. See CTI v. Harnett (CTI II), No. 12-12385, 2013 WL 3334979, at *1-2 (D. Mass. May 3, 2013). Its decree restrained Harnett from engaging "in any marketing or sales efforts . . . for a period of twelve months" with respect to several CTI customers whom he formerly had serviced. Id. at *1. With regard to those customers, it also compelled the defendants to withdraw any bids that Harnett had helped to develop. See id.

This timely appeal followed. Notwithstanding its interlocutory character, we have jurisdiction under 28 U.S.C. § 1292(a)(1). Because the issues are time-sensitive, we expedited briefing and oral argument.

## II. ANALYSIS

In determining whether to grant a preliminary injunction, the district court must consider: (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996).

In this diversity case, the law of Massachusetts supplies the substantive rules of decision. See Erie R.R. Co. v. Tompkins,

-4-

304 U.S. 64, 78 (1938); <u>Crellin Techs., Inc.</u> v. <u>Equipmentlease Corp.</u>, 18 F.3d 1, 4 (1st Cir. 1994). The district court found that factors two through four of the preliminary injunction paradigm counseled in favor of, or at least were consistent with, the grant of injunctive relief. <u>See</u> <u>CTI I</u>, 2013 WL 18913078, at *7-10. The defendants, by their silence, have acquiesced in these findings.[1] <u>See</u>, <u>e.g.</u>, <u>Ross-Simons</u>, 102 F.3d at 16 (addressing only those prongs of the preliminary injunction paradigm challenged by the appellant).

But the four factors are not entitled to equal weight in the decisional calculus; rather, "[l]ikelihood of success is the main bearing wall of the four-factor framework." <u>Id.</u> The defendants have staked their appeal entirely on the perceived fragility of this main bearing wall, decrying the district court's determination that CTI was likely to succeed on the merits of its claims.

Our standard of review is familiar. When assaying a trial court's ruling on a motion for a preliminary injunction, "we scrutinize abstract legal matters de novo, findings of fact for clear error, and judgment calls with considerable deference to the

---

[1] There is a potential question about the fourth element of the preliminary injunction paradigm. Under Massachusetts law, a court need not consider the effect of an injunction on the public interest. <u>See</u> <u>Hull Mun. Lighting Plant</u> v. <u>Mass. Mun. Wholesale Elec. Co.</u>, 506 N.E.2d 140, 144 (Mass. 1987). It might be argued in a diversity case that state law supplants federal law in this regard. Here, however, neither side raises any issue about the fourth element. Consequently, we need not probe this point more deeply. <u>See</u> <u>Ocean Spray Cran., Inc.</u> v. <u>PepsiCo, Inc.</u>, 160 F.3d 58, 61 (1st Cir. 1998).

-5-

trier."  New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).  We will disturb the ruling below only if the court abused its discretion.  See id.

Abuse-of-discretion review is respectful but appellate deference is not unbridled.  For one thing, a material error of law invariably constitutes an abuse of discretion.  See Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 221 (1st Cir. 2003).  For another thing, an abuse of discretion "occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when . . . the court makes a serious mistake in weighing [the relevant factors]."  Indep. Oil and Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988).

## A.  **Breach of the Non-Solicitation Agreement**.

The non-solicitation provision contained in the Agreement prohibits Harnett from "solicit[ing], divert[ing] or entic[ing] away existing [CTI] customers or business" for a period of twelve months following the cessation of his employment.  The dispute between the parties turns on the distinction between actively soliciting and merely accepting business — a distinction that the Massachusetts Appeals Court aptly termed "metaphysical."  Alexander & Alexander, Inc. v. Danahy, 488 N.E.2d 22, 30 (Mass. App. Ct. 1986).

The defendants argue that because the customers in question initiated contact with Harnett, he was thereafter free to deal with them without being guilty of solicitation.  CTI demurs.

It points out that the customers only contacted Harnett following their receipt of a blast email announcing his hiring by OnX. This email was sent to a targeted list of prospects, approximately forty percent of whom were (or at least, had been) CTI customers. The record shows numerous interactions between Harnett and the customers after initial contact — and CTI touts these interactions as compelling evidence that Harnett engaged in solicitation.

The line between solicitation and acceptance of business is a hazy one, and the inquiry into where this line should be drawn in a particular case is best executed by the district court. See Reliance Steel Prods. Co. v. Nat'l Fire Ins. Co., 880 F.2d 575, 576 (1st Cir. 1989) (observing that fact-intensive inquiries are "the staples of a trial court's diet, and comprise an unappetizing . . . bill of fare for appellate digestion"). This is especially true at the preliminary injunction stage — a stage at which the district court is required only to make an estimation of likelihood of success and "need not predict the eventual outcome on the merits with absolute assurance." Ross-Simons, 102 F.3d at 16. Consistent with this structure, our task is merely to determine whether the district court's conclusion falls within a range of reasonably probable outcomes. See id.

The defendants seek to change the trajectory of the debate by insisting that, once a customer initiates contact with an employee who has switched his affiliation, all bets are off and subsequent business activity cannot as a matter of law constitute solicitation. This argument is simply a linguistic trick: creative

relabeling, without more, is insufficient to transform what is manifestly a question of fact into a question of law. See Fed. Refin. Co. v. Klock, 352 F.3d 16, 27 (1st Cir. 2003).

To be sure, Massachusetts trial courts have accorded varying degrees of significance to initial contact depending on the facts at hand, compare Oceanair, Inc. v. Katzman, No. 00-3343, 2002 WL 532475, at *6 (Mass. Super. Ct. Jan. 22, 2002) (treating initial contact as crucial), with McFarland v. Schneider, No. 96-7097, 1998 WL 136133, at *37-38, *44 (Mass. Super. Ct. Feb. 17, 1998) (treating initial contact as non-dispositive), and the parties each point to language that seems to speak in their favor. But these trial court decisions have no precedential force, see Dayton v. Peck, Stow and Wilcox Co. (Pexto), 739 F.2d 690, 694 n.5 (1st Cir. 1984), and in any event, no consensus emerges from them. Where, as here, the highest court of a state has not spoken to a question of state law, our precedents teach that we should look, among other things, to "persuasive adjudications by courts of sister states" and "public policy considerations." Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1151 (1st Cir. 1996).

After careful consideration, we conclude that the Massachusetts Supreme Judicial Court, if confronted with the question, would hold that a per se rule vis-à-vis initial contact has no place in this equation. In reaching this conclusion, policy considerations loom large.

In the employment context, restrictive covenants are meant to afford the original employer bargained-for protection of

its accrued good will.  See generally Marine Contractors Co. v. Hurley, 310 N.E.2d 915, 920 (Mass. 1974).  According decretory significance to who makes the first contact would undermine this protection because that factor, standing alone, will rarely tell the whole tale.  And because initial contact can easily be manipulated — say, by a targeted announcement that piques customers' curiosity[2] — a per se rule would deprive the employer of its bargained-for protection.

There is a related consideration.  The defendants argue as if "initial contact" is a term of art, capable of conveying a fixed meaning.  But that is not the case.  Initial contact can entail anything from a call to ascertain the circumstances of a defendant's new employment, see, e.g., Getman v. USI Holdings Corp., No. 05-3286, 2005 WL 2183159, at *4 (Mass. Super. Ct. Sept. 1, 2005), to the placement of an order, see, e.g., Liberty Mut. Ins. Co. v. Batchelor, No. 09-4170, 2009 WL 5910242, at *1 (Mass. Super. Ct. Nov. 23, 2009).  At many points along this continuum, the initial contact will be preliminary and, thus, unlikely to bear fruit in the absence of subsequent solicitation.  The amorphous nature of the term counsels persuasively against a per se rule.

This lack of precise meaning is reinforced by yet another factor: the weight that initial contact should be given depends to some extent on the setting in which a particular case arises.  In an industry in which a defendant subject to a non-solicitation

---

[2] The announcement that OnX made in this instance, discussed infra, illustrates this point.

agreement is peddling fungible, off-the-shelf goods, initial contact might weigh heavily. In contrast, where the sales process is complex and the products are customized, initial contact is usually at a considerable remove from a closed sale. In such a situation, initial contact is likely to weigh far less heavily. This variable militates strongly against a bright-line rule.

In the last analysis, we believe that the better view holds that the identity of the party making initial contact is just one factor among many that the trial court should consider in drawing the line between solicitation and acceptance in a given case. This flexible formulation not only reflects sound policy but also comports with well-reasoned case law from other jurisdictions. See, e.g., Bessemer Trust Co. v. Branin, 949 N.E.2d 462, 469 (N.Y. 2011) (declining to create a "hard and fast rule"). Thus, we decline the defendants' invitation to assign talismanic importance to initial contact.

Discerning no error of law, we need not tarry over the district court's weighing of the facts. This is a situation in which the initial contacts by customers are necessarily preliminary, the sales process is sophisticated, and the products are custom-tailored. Viewed against this backdrop, the evidence of record is adequate to underpin the lower court's binary determination that Harnett violated the non-solicitation covenant and that the plaintiff is therefore likely to succeed on the merits.

There is no need for us to wax longiloquent. Solicitation can take many forms, and common usage suggests that the word has a protean quality. See, e.g., The Compact Edition of the Oxford English Dictionary 2911 (1971) ("To entreat or petition (a person) for, or to do, something; to urge, importune; to ask earnestly or persistently."). Here, moreover, the non-solicitation provision specifically forbids Harnett from "entic[ing] away" customers of CTI.

Harnett's own words and actions with respect to customers covered by the non-solicitation provision lend considerable credence to the district court's tentative conclusion that he violated that provision. His calendar, email, and testimony show significant business communications with at least four of his former CTI customers on behalf of OnX. This persistent pattern of pursuing patronage permits a plausible inference that he was urging those customers to do business with OnX rather than CTI (in other words, an inference that he was trying to entice them away).

What is more, Harnett organized several meetings with CTI customers designed to facilitate future sales and admitted in his deposition that he had transmitted product pricing information to them. Additionally, he submitted no fewer than ten requests for registered opportunities (ROs) to third-party information technology vendors, in which he sought exclusive discounts for future sales proposals to CTI customers. These submissions are telling because ROs are a prerequisite to obtaining orders from customers in this specialized field.

-11-

We add one last point.  Even though we have entertained the parties' supposition that it was the customers who made the initial contacts, the record shows that those customers reached out to Harnett only in response to a blast email from OnX.  While we do not question the rights of parties to make public announcements of changes in employment, "targeted mailings" to former customers may cross the line into impermissible solicitation.  Bessemer, 949 N.E.2d at 469.  Given how many of Harnett's clients were on the relatively short email list, it was plausible to infer here (as the district court apparently did) that the email was part and parcel of a pattern of solicitation.

Harnett's overall course of conduct is most vividly exemplified by what happened with a particular customer.[3]  On November 8, 2012 — shortly after Harnett switched sides and in direct response to OnX's blast email — a high-ranking Company X executive contacted OnX in order to set up a meeting with Harnett.  Harnett arranged the meeting and brought along OnX's chief technology officer.  Harnett's calendar over the next several weeks reflects periodic contacts (and reminders to schedule calls) with Company X, as well as an internal OnX call to discuss the customer.  Furthermore, Harnett admitted in his deposition that there were other calls not shown in his calendar.

On December 3, Harnett submitted a request for an RO anent Company X to a third-party vendor.  Eleven days later, he

---

[3] The particular customer is well-known to the parties but, due to confidentiality concerns, we refer to it only as "Company X."

reviewed with Company X's management a sales proposal that had been submitted by OnX to Company X. This process culminated in a completed sale. One could more readily believe in the Tooth Fairy than believe that this course of conduct was insufficient to ground a finding of probable solicitation.

In an endeavor to denigrate the force of the district court's reasoning, the defendants say that the court confused the non-solicitation provision — which did not bar Harnett from all competition but, rather, barred him from soliciting CTI's customers — with a non-competition provision. We have scoured the record and find no indication that the district court labored under any such misapprehension. To the contrary, the record shows that the court understood the parameters of the non-solicitation provision and appropriately applied those parameters.

Given the court's supportable findings of fact, its conclusion that Harnett likely engaged in solicitation was reasonable. In turn, that reasonable conclusion suffices to warrant its grant of injunctive relief.

### B.  Other Issues.

There are a few loose ends. We proceed to tie up each of them.

In their opening brief, the defendants challenged the district court's finding that OnX tortiously interfered with CTI's rights under the Agreement. This challenge was premised on the solitary ground that Harnett's activities did not support a finding that he had likely engaged in impermissible solicitation.

Accordingly, the challenge is undercut by our conclusion that the district court neither erred nor abused its discretion in finding a likelihood that Harnett engaged in impermissible solicitation.

In their reply brief, the defendants sought to shift gears and make a different argument. There, they asserted that the evidence did not permit the district court to find the improper motive or means required to sustain a cause of action for tortious interference. See Blackstone v. Cashman, 860 N.E.2d 7, 12-13 (Mass. 2007) (explaining that the plaintiff must prove that the defendant's interference, "in addition to being intentional, was improper in motive or means"). It is settled law that, in the absence of exceptional circumstances, an appellant cannot raise new arguments for the first time in a reply brief. See Cahoon v. Shelton, 647 F.3d 18, 29 n.8 (1st Cir. 2011); Sandstrom v. ChemLawn Corp., 904 F.2d 83, 86 (1st Cir. 1990). The instant case presents no exceptional circumstances sufficient to relieve the defendants from the operation of this preclusory rule.

This brings us to the defendants' final broadside: their contention that the district court misapplied the "inevitable disclosure" doctrine. This doctrine, sparingly used in Massachusetts, allows an employer to prove trade secret misappropriation by demonstrating that its former employee's new employment will inevitably lead him to rely on his knowledge of the plaintiff's trade secrets. See PepsiCo, Inc. v. Redmond, 54 F.3d 1262, 1269 (7th Cir. 1995). In the defendants' view, the district court should not have incorporated the doctrine into its likelihood

-14-

of success analysis on the claimed violation of the non-disclosure agreement.  This is so, the defendants say, because the doctrine bears only on the presence of irreparable harm.  See U.S. Elec. Servs., Inc. v. Schmidt, No. 12-10845, 2012 WL 2317358, at *9 (D. Mass. June 19, 2012) (discussing cases).

We need not plunge into this thicket.  Here, there was sufficient record evidence for the district court to infer that it was likely that Harnett actually used CTI's confidential information in order to secure business for OnX.  See CTI I, 2013 WL 1891308, at *6.  No more was exigible to support the preliminary injunction that the court issued with respect to the non-disclosure agreement.[4]  We explain briefly.

When Harnett left CTI's employ, he took with him about twenty-five pages of notes that contained confidential information, much of it related to potential sales.  The court narrowly tailored the preliminary injunction with respect to non-disclosure, enjoining only the use of information contained in Harnett's notes. The court's comments about inevitable disclosure, whether or not correct, were therefore harmless.

## III.  CONCLUSION

We need go no further.  For the reasons elucidated above, we uphold the district court's entry of the preliminary injunction.

**Affirmed.**

---

[4] We note that the defendants' briefs do not contend that the lower court's use of the "inevitable disclosure" doctrine contaminated its findings on the claimed breach of the non-solicitation agreement.

-15-