

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-20-00328-CV
_____

NANCY WEBSTER AND EPIC INSURANCE BROKERS & ASSOCIATES,
APPELLANTS

V.

ARTHUR J. GALLAGHER & COMPANY, APPELLEE

On Appeal from the 345th
Travis County, Texas
Trial Court No. D-1-GN-20-004823, Honorable Scott Jenkins, Presiding

July 7, 2021

## MEMORANDUM OPINION

Before QUINN, C.J., and PIRTLE and PARKER, JJ.

Nancy Webster voluntarily signed a contract with Arthur J. Gallagher & Company when it first employed her. The agreement contained a confidentiality clause and other restrictive covenants governing her actions if and when she left the company. She left after a number of years and assumed a position with EPIC Insurance Brokers & Associates. Apparently, Webster refused to abide by her prior agreement with Gallagher, resulting in her earlier employer initiating suit and obtaining a temporary injunction against her and those in concert with her.[1] The aspects of the injunction in play here are those

---

[1] Gallagher also sued EPIC but did not name it as a party to be enjoined. Nor did the temporary injunction issued by the trial court expressly enjoin EPIC from doing anything.

which bar her from 1) "[u]sing, disclosing, or further acquiring Gallagher's trade secrets and other confidential information, including its financial data or its customer's identities and contact information"; 2) "[d]irectly or indirectly rendering any services for a Gallagher client or prospective client with which [she] worked, provided services to, or communicated" with; and 3) "[s]oliciting current or prospective Gallagher clients with whom she worked, provided services to, or had contact with during the two-year period prior to her resignation." Both Webster and EPIC appealed issuance of that injunction. Eight issues, some with multiple sub-issues, pend for our review. We affirm.[2]

*Authority*

The standard of review was discussed in *Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911 (Tex. 2020). It is one of abused discretion, *id.* at 916–17, and we apply it here.

Under that standard, we cannot simply substitute our judgment for that of the trial court. *Butnaru v. Ford Motor Corp.*, 84 S.W.3d 198, 211 (Tex. 2002). Instead, the appellant must illustrate that the trial court acted unreasonably, arbitrarily, or without reference to guiding rules and principles. *Id.* That is, the order must be "'so arbitrary that it exceed[s] the bounds of reasonable discretion.'" *Henry v. Cox*, 520 S.W.3d 28, 33–34 (Tex. 2017) (quoting *Butnaru v. Ford Motor Corp., supra*). And discretion is not abused if the evidence reasonably supports the court's decision. *Abbott*, 610 S.W.3d at 916–17; *Henry*, 520 S.W.3d at 33–34; *Butnaru*, 84 S.W.3d at 211.

Furthermore, one seeking a temporary injunction must plead and prove 1) a cause of action against the defendant, 2) a probable right to the relief sought, and 3) a probable

---

[2] Because this appeal was transferred from the Third Court of Appeals, we are obligated to apply its precedent when available in the event of a conflict between the precedents of that court and this Court. *See* TEX. R. APP. P. 41.3.

imminent and irreparable injury in the interim. *Abbott*, 610 S.W.3d at 916. It must be remembered, though, that the temporary relief of the injunction serves to maintain the status quo pending final adjudication. *Butnaru*, 84 S.W.3d at 204; *DHJB Dev., LLC v. Graham*, No. 03-18-00343-CV, 2018 Tex. App. LEXIS 9295, at *2–3 (Tex. App.—Austin Nov. 15, 2018, pet. dism'd) (mem. op.). For this reason and to satisfy the element concerning a probable right of success, the applicant need not establish that it will win at trial. *R & R Res. Corp. v. Echelon Oil & Gas, L.L.C.*, No. 03-05-00479-CV, 2006 Tex. App. LEXIS 326, at *23 (Tex. App.—Austin Jan. 10, 2006, no pet.) (mem. op.). It is enough to allege a cause of action and present evidence that tends to support it. *Id.* The merits of the claim are not under review. *Henry*, 520 S.W.3d at 33–34.

*Analysis*

The general theme of Webster's complaint is "[w]hether as a matter of law the temporary injunction wrongly restrains Ms. Webster from accepting or providing services to unsolicited health insurance clients who no longer want to do business with Gallagher." Multiple, and extended, arguments were proffered in support thereof. Our disposition of them is not so extended. And, we so dispose of them by climbing the same ladder Gallagher was required to climb below.

The first rung concerns a cause of action. Gallagher averred that Webster breached her employment contract with it. The terms allegedly breached were found under the category of "post-employment obligations." One obligated her to forgo "divulg[ing] the Company's Confidential Information or make use of it for [her] own purpose or the purpose of another" for "a period of two (2) years following the termination of [her] employment." Under another, she agreed to not:

> (i) directly or indirectly, solicit, place, accept, aid, counsel or
> consult in the renewal, discontinuance or replacement of any

3

insurance or reinsurance by, or handle self-insurance programs, insurance claims or other insurance administrative functions ("insurance services") for, any existing Company account or any actively solicited prospective account of the Company for which [s]he performed any of the foregoing functions during the two-year period immediately preceding such termination or (ii) provide any employee benefit brokerage, consulting, or administration services, in the areas of group insurance, defined benefit and defined contribution pension plans, individual life, disability and capital accumulation products, and all other employee benefit areas ("benefit services") the Company is involved with, for any existing Company account or any actively solicited prospective account of the Company for which [s]he performed any of the foregoing functions during the two-year period immediately preceding such termination.

The foregoing obligations allegedly were breached when Webster quit the employ of Gallagher, assumed a position with a competitor, i.e., EPIC, and began soliciting clients of Gallagher. Given these circumstances, the trial court had evidence before it of a cause of action, that being breach of contract.

We now turn to the second rung, that being a probable right to relief. This seems to be the element upon which Webster focused the brunt of her attack. Again, Gallagher complains of Webster breaching the non-solicitation and non-disclosure clauses of her agreement. That such clauses may be enforceable and their temporary enforcement the legitimate subject of a preliminary injunction is clear. *See, e.g.*, *York v. Hair Club for Men, L.L.C.*, No. 01-09-00024-CV, 2009 Tex. App. LEXIS 4866, at *14 (Tex. App.–Houston [1st Dist.] June 25, 2009, no pet.) (mem. op.) (holding "that the non-solicitation and non-disclosure agreements here are enforceable," "Hair Club has a probable right to relief under them," and the trial court "did not abuse its discretion in granting a temporary injunction on this ground"). Wester began her attack on this rung, though, by contending that the trial court had before it no evidence of her soliciting Gallagher clientele. Yet, the record illustrates otherwise. She notified her "professional contacts" of her departure and

4

new employer; those notified included "prior Gallagher clients." She did so because 1) "[s]ome of those customers [were] nearing their renewal"; 2) "[t]hey were relying heavily upon [her]"; and 3) "[she] felt it very important for them to know [she didn't] work at Gallagher anymore." Those customers were also directed by her to where they could obtain information about EPIC. Other evidence indicated her voluntary departure from Gallagher was rather hasty and its timing rather fortuitous. She afforded the company only brief prior notice, and her departure from and ensuing retention by EPIC transpired when Gallagher's "customers [were] nearing their renewal." The coincidence between policies coming up for renewal, Webster's acknowledgement that her clients relied heavily on her, the importance of letting them know she worked for a different company, telling Gallagher clients where they could find information about her new employer EPIC, and EPIC being a competitor of Gallagher are indicia sufficient to create a foundation from which a fact-finder could reasonably infer that Webster solicited Gallagher customers. It is all too true that successful salesmen know the art of subtlety and nuance to sway customers. It is not unheard of for such art to be practiced on clients to entice them to newer venues. Indeed, that has been observed by other jurists, such as the panel that wrote "initial contact can easily be manipulated – say, by a targeted announcement that piques customers' curiosity." *See Corporate Techs., Inc. v. Harnett*, 731 F.3d 6, 11 (1st Cir. 2013). Given the foregoing evidence, we find no fault in the trial court inferring that solicitation of Gallagher clients occurred here when Webster notified them of her departure.

Another foray directed at the element of probable success implicated the serving of Gallagher clients who purportedly left without solicitation by her. A "restrictive covenant that purports to prohibit a former employee . . . from accepting or servicing clients when

5

those clients voluntarily elect to move their business to the former employee's new employer . . . without any solicitation or use of the former employer's confidential information is unlawful," she contended. It allegedly is so for several reasons. The first is that "[t]he 'no acceptance and no service' restriction, in the absence of solicitation, does not serve a legitimate purpose." Yet, she admitted otherwise in the employment agreement. For instance, affixing her signature to her accord with Gallagher back in 2004 gave life to paragraph 10. Through it, she expressly "recognize[d] the highly sensitive nature of the Confidential Information to which [s]he will have access during [her] employment, and acknowledge[d] the Company's *legitimate interest* in safeguarding same from disclosure." (Emphasis added). The same was no less true regarding paragraph 11. There, Webster "recognize[d] the Company's *legitimate interest* in protecting, for a reasonable period of time following the termination of the Executive's employment, those Company accounts and prospective accounts including the Acquired Business with which the Executive has been and will be associated during [her] employment." (Emphasis added). One can hardly criticize the trial court for finding that Gallagher had legitimate interests in the acts encompassed within the restrictive covenants when Webster herself acknowledged it did.

Next, Webster suggested that Gallagher's likelihood of success was minimal because she "did not need or use Gallagher confidential information regarding any clients who have sought her out." Per the agreement, though, confidential information included "lists of prospects," "the identity, authority and responsibilities of key contacts at Company accounts'" "policy expiration dates," "the composition and organization of accounts' businesses" and "the peculiar risks inherent in their operations." It would not be unreasonable to view the people with whom she dealt when selling Gallagher products

as "key contacts." Having sold them insurance products addressing their employer's needs suggests an awareness of the composition and organization of those employers as well as the peculiar risks inherent in their operations. And, as noted earlier, Webster solicited them. So, these are circumstances which the trial court could have viewed as her use of "confidential information"; and that is the very "confidential information" in which she acknowledged Gallagher had a "legitimate interest in safeguarding."

Moreover, it defies common sense to suggest that an employee can scrub his mind of all things learned from an employer over extended periods of employment. They may want to, but it is reasonable to conclude they cannot. That is the situation with Webster and her 16 years under the employ of Gallagher. We are not the first to observe that individuals "might have difficulty preventing their knowledge" of confidential information or trade secrets "from infiltrating their work" when later employed by a competitor. *See Hill v. McLane Co.*, No. 03-10-00293-CV, 2011 Tex. App. LEXIS 169, at *14 (Tex. App.—Austin Jan. 5, 2011, no pet.) (mem. op.); *accord Williams v. Compressor Eng'g. Corp.*, 704 S.W.2d 469, 472 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (stating that "[e]ven when he operates in the best of good faith, the former employee working in a similar capacity can hardly prevent his knowledge of his former employer's confidential methods from showing up in his work"). Additionally, pricing structures utilized by Gallagher would be one category of information likely to be remembered and incorporated into her efforts to win clients from Gallagher, whether solicited by her or not. Renewal or expiration dates would be another.[3] Knowing them would be to know aspects of Gallagher's "confidential information." And, we reiterate that Webster agreed that

---

[3] Other information given Webster, according to Gallagher, included "client lists, client contact information, as well as who the decision-makers were . . . as well as [Gallagher's] scope of services, our pricing, our strategies with respect to how it is we go about delivering services."

7

Gallagher had a "legitimate interest" in protecting such. So, irrespective of whether Gallagher clientele came to EPIC through her solicitations, she had information from Gallagher to use to the advantage of her new employer, EPIC.[4]

Another aspect of Webster's own conduct bears mention. It involves her twice voluntarily signing a restrictive covenant limiting her ability to generally service clients of a former employer. The first was that of Gallagher. The second was that of EPIC. Simply put, EPIC utilized restrictive covenants akin to those of Gallagher, and Webster signed both. Moreover, that of EPIC was signed after she discussed the Gallagher covenant with her new employer. If nothing else, this scenario illustrates that the insurance industry is fraught with competition. Insurers, along with their employees, are aware of this and the need to maintain and protect competitive advantages. Those advantages can be lost through employees leaving one employer for another and utilizing, innocently or not, information garnered from the former for the latter. As we observed earlier, scrubbing minds of all things learned from an earlier employer is no easy task, and that knowledge can come to infiltrate an employee's later work for clientele of a competitor, irrespective of whether the employee solicited the competitor.

Webster also raises the specter of stifled competition in the age of COVID-19 to attack the enforceability of the restrictive covenants. Yet, neither the restrictive covenants nor the temporary injunction inhibit prospective customers from obtaining insurance products from EPIC. Nor do they bar EPIC from soliciting business from anyone, including Gallagher clientele. They simply regulate Webster's role in the transaction and the use of Gallagher's confidential information garnered from her.

---

[4] This also means that more than just "goodwill" between Gallagher and its clientele was at stake. Assuming *arguendo* that Webster correctly suggests that goodwill ends when a client leaves, Gallagher still had legitimate interests in it as we discuss *infra*.

Effort is made by Webster to also attack the third rung of the ladder. Purportedly, Gallagher's potential injuries arising from her violation of the restrictive covenants are subject to adequate redress through damages and, consequently, non-irreparable. In answer, we quote a passage from *Tranter, Inc. v. Liss*, No. 02-13-00167-CV, 2014 Tex. App. LEXIS 3398 (Tex. App.—Fort Worth Mar. 27, 2014, no pet.) (mem. op.). "A highly trained employee's continued breach of a noncompete agreement creates a rebuttable presumption that the employer is suffering an irreparable injury." *Id.* at *21–22. Indeed, in "Texas, injury resulting from the breach of non-compete covenants is the epitome of irreparable injury.'" *USI Sw., Inc. v. Edgewood Partners Ins. Ctr*, No. 4:19-CV-04768, 2020 U.S. Dist. LEXIS 79537, at *8 (S.D. Tex. 2020) (quoting *A & A Global Indus., Inc. v. Wolfe*, No. 3:01CV1515-D, 2001 U.S. Dist. LEXIS 18142 (N.D. Tex. Nov. 6, 2001)). As the *USI* court said when issuing a temporary injunction against a former employee who came to work for Edgewood:

> the resultant harm to Plaintiff's good will and reputation with its customers are not easily quantifiable. In some aspects, insurance brokerage companies ultimately provide the same end product—insurance—to their clients. Therefore, companies strive to differentiate their services by various proprietary and confidential means. Randolph had access to those proprietary aspects of USI's business. Some of these include client information (including names and decision-makers), . . . and revenue information. Most of this information is what gives a company its good will or competitive advantages which enable it to retain its clients' business and acquire new clients. If this information is disclosed, an entity would lose whatever edge it has in a very competitive business sector. Moreover, if this information is disclosed to a head-to-head competitor, the damage would be irreparable.

*Id.* at *8–9. The names Webster and Gallagher easily could be substituted for "Randolph" and "USI," respectively, given the similarities involved there and here. This seems especially so when Gallagher's representative answered "no" when asked "[d]o you have

9

any way to estimate what [the company's] . . . loss might look like in the future" due to Webster's activities at EPIC. Gallagher's representative testified about how goodwill developed with a client over time enhances the prospect of selling other products to those clients.[5] So, like in *USI*, finding a probable imminent and irreparable injury here would fall within the realm of rationality.

In sum, our task is not to adjudicate the underlying merits of the fight between Gallagher, Webster, and EPIC. Nor was it the obligation of the trial court. The latter was called upon only to address whether the status quo should be maintained by issuing a temporary injunction. Given the evidence before it and the elements described in *Abbott*, we cannot say that the order granting the temporary injunction at bar is "so arbitrary that it exceed[s] the bounds of reasonable discretion."

The issues of Webster and EPIC are overruled. The order granting Gallagher the temporary injunction is affirmed.


Brian Quinn
Chief Justice

---

[5] The witness described the situation "more like a marathon, not a sprint, because it takes quite a bit of time to develop the relationships and then sell the business over a period of time." This leads to developing "additional lines of revenue." As he said, "[w]e bring in other services where we have other practice areas, specialty practice areas, which creates additional revenue. Many times we get business through referrals and simply from the goodwill and the client base that generates over a period of time." That over time, the relationship develops in a way leading to the opportunity of pursuing additional lines of revenue depicts the value of maintaining goodwill with clients. Thus, one can reasonably infer that goodwill is a legitimate interest in the mind of an insurance broker worthy of protection under the law.