Loughlin v Meghji (2020 NY Slip Op 05196)





Loughlin v Meghji


2020 NY Slip Op 05196


Decided on September 30, 2020


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on September 30, 2020
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

ALAN D. SCHEINKMAN, P.J.
CHERYL E. CHAMBERS
LEONARD B. AUSTIN
ROBERT J. MILLER, JJ.


2016-11544
2018-00518
2018-01235
 (Index No. 606517/14)

[*1]James J. Loughlin, Jr., respondent-appellant,
v
Mohsin Y. Meghji, appellant-respondent.


Golenbock Eiseman Assor Bell & Peskoe LLP, New York, NY (Jeffrey T. Golenbock and Mary Ellen O'Brien of counsel), for appellant-respondent.
Forchelli Deegan Terrana LLP, Uniondale, NY (Peter Basil Skelos, Jeffrey G. Stark, Michael A. Ciaffa, and Nathan R. Jones of counsel), for respondent-appellant.
In an action, inter alia, to recover damages for breach of a restrictive covenant, (1) the defendant appeals from an order of the Supreme Court, Nassau County (Stephen A. Bucaria, J.), entered October 13, 2016, (2) the defendant appeals, and the plaintiff cross-appeals, from a judgment of the same court entered December 4, 2017, and (3) the defendant appeals, and the plaintiff cross-appeals, from an amended judgment of the same court entered December 21, 2017. The order denied the defendant's motion for summary judgment dismissing the complaint and on his counterclaim. The judgment and the amended judgment, insofar as appealed from, upon the order entered October 13, 2016, and upon decisions of the same court entered August 22, 2017, and November 14, 2017, respectively, made after a nonjury trial, awarded the plaintiff damages in the principal sum of $825,000 and attorneys' fees in the principal sum of $755,160. The judgment and the amended judgment, insofar as cross-appealed from, awarded the plaintiff damages in the principal sum of only $825,000 and attorneys' fees in the principal sum of only $755,160.



DECISION & ORDER
Motion by the plaintiff to dismiss the appeal from the order on the ground that the right of direct appeal terminated upon the entry of the amended judgment. By decision and order on motion of this Court dated April 4, 2018, the motion was held in abeyance and referred to the panel of Justices hearing the appeals and cross appeals for determination upon the argument or submission thereof.
Upon the papers filed in support of the motion and the papers filed in opposition thereto, and upon the argument of the appeals and cross appeals, it is
ORDERED that the motion is granted; and it is further,
ORDERED that the appeal from the order is dismissed; and it is further,
ORDERED that the appeal and the cross appeal from the judgment are dismissed, as the judgment was superseded by the amended judgment; and it is further,
ORDERED that the amended judgment is modified, on the law and the facts, (1) by deleting the provision thereof awarding the plaintiff damages in the principal sum of $825,000, and substituting therefor a provision awarding the plaintiff nominal damages in the principal sum of $1, and (2) by deleting the provision thereof awarding the plaintiff attorneys' fees in the principal sum of $755,160; as so modified, the amended judgment is affirmed insofar as appealed and cross-appealed from, and the matter is remitted to the Supreme Court, Nassau County, for a hearing and a new determination on the issue of the award to the plaintiff of the costs and expenses of this litigation, including two times reasonable attorneys' fees, pursuant to paragraph 10.11 of the parties' agreement of purchase and sale of stock and for the entry of an appropriate second amended judgment in accordance herewith; and it is further,
ORDERED that one bill of costs is awarded to the plaintiff.
The appeal from the order must be dismissed because the right of direct appeal therefrom terminated with the entry of the judgment in the action (see Matter of Aho, 39 NY2d 241, 248). The issues raised on the appeal from the order are brought up for review and have been considered on the defendant's appeal from the amended judgment (see CPLR 5501[a][1]).
In 2002, the plaintiff and the defendant formed Loughlin Meghji & Co. Associates, Inc. (hereinafter the Corporation), a consulting firm, in which each held a 50% interest. They also formed Loughlin Meghji Investments, LLC (hereinafter the LLC), an investment company, in which they were each 50% members. On October 14, 2011, the plaintiff and the defendant entered into an "Agreement of Purchase and Sale of Stock" (hereinafter the PSA) wherein the plaintiff purchased the defendant's shares of the Corporation and membership interest in the LLC for $7.5 million.
Pursuant to paragraph 9.1.1 of the PSA, for a two-year period, the defendant was restricted from "engag[ing] in the business of providing consulting services in connection with corporate restructurings for his own account or otherwise engag[ing] in business activities that directly or indirectly compete[d] with the business of the Corporation as of May 10, 2011." This provision also stated that: "Notwithstanding anything else in this paragraph 9.1 to the contrary, this restriction on competition is not intended to and does not restrict [the defendant] from engaging in any activities that, as of May 10, 2011, do not constitute a part of the business of the Corporation, or that at the time such activities are undertaken by [the defendant], do not compete with the business of the Corporation as of such time."
Paragraph 9.2 provided that, for that same two-year period, the defendant was restrained from "contact[ing] any customer . . . of the Corporation for the purpose of soliciting or diverting any such customer . . . or any of their respective business, from the Corporation."
Paragraph 10.11 provided that, in the event that litigation was commenced arising out of the PSA, that, "the substantially prevailing party shall be entitled to an award of the costs and expenses of such litigation, including two times reasonable attorneys' fees."
In January 2012, Springleaf Finance, Inc. (hereinafter Springleaf), a company then primarily in the business of issuing subprime loans to consumers, hired the defendant as an executive vice president and head of strategy and corporate development. The defendant was employed by Springleaf until February 28, 2014.
In December 2014, the plaintiff commenced this action against the defendant to recover damages resulting from the defendant's breach of the non-solicitation covenant as the first cause of action, to recover damages for the defendant's breach of the covenant not to compete as the second cause of action, and to recover his attorneys' fees pursuant to paragraph 10.11 of the PSA as the third cause of action. The plaintiff alleged that the Corporation and its successor "was and is in the business of providing consulting services in connection with corporate restructurings." The plaintiff further alleged that the defendant violated the restrictive covenants by accepting employment with Springleaf, whose chief executive officer, Jay Levine, had previously been the chief executive officer of one of the Corporation's former customers, Capmark Financial Group, Inc. [*2](hereinafter Capmark), since the defendant allegedly was responsible for advising Springleaf as to corporate restructuring. In his answer, the defendant interposed a counterclaim against the plaintiff for an award of attorneys' fees pursuant to paragraph 10.11 of the PSA.
The defendant moved for summary judgment dismissing the complaint and on his counterclaim. In an order entered October 13, 2016, the Supreme Court denied the defendant's motion and, sua sponte, determined that the provision in paragraph 10.11 of the PSA allowing for two times the amount of attorneys' fees expended was an unenforceable penalty.
Following a nonjury trial, the Supreme Court issued a decision entered August 22, 2017, finding that the defendant's work as an employee of Springleaf involved corporate restructuring in violation of the covenant not to compete and that the plaintiff was entitled to recover damages in the principal sum of $825,000 for lost profits. The court did not make a finding as to whether the defendant violated the non-solicitation covenant and, in effect, directed dismissal of that cause of action. The court calculated the amount of damages predicated upon Capmark's payment to the Corporation of a gross fee of $275,000 per month for the work that it had performed for Capmark. The court reduced the gross fee by one half, to $137,500 per month, by deducting labor costs and expenses. The court determined that the defendant had spent six months as an employee of Springleaf on Springleaf's restructuring, and multiplied the net monthly figure that it had decided that the plaintiff had lost as profits by six for a total of $825,000. In a separate decision entered November 14, 2017, the court determined that the plaintiff was entitled to an award of attorneys' fees in the principal sum of $755,160 based upon a total of 1,774.3 hours billed at a rate of $435 per hour, without applying the double attorneys' fee provision of the PSA. A judgment was entered upon the two decisions, and subsequently an amended judgment was entered, which is in favor of the plaintiff and against the defendant awarding damages in the principal sum of $825,000, and awarding the plaintiff attorneys' fees in the principal sum of $755,160. The defendant appeals from the amended judgment, arguing that his motion for summary judgment should have been granted, that the evidence did not demonstrate that he violated the restrictive covenants, that the evidence was legally insufficient to sustain an award for lost profits, and that, as a result, the plaintiff was not entitled to an award of attorneys' fees since he was not the prevailing party. The plaintiff cross-appeals from so much of the amended judgment as awarded him damages in the principal sum of only $825,000 rather than the principal sum of $1,929,000, representing the value of the covenant not to compete as valued by his expert, or, in the alternative, in the amount of $2,887,500 for a 21-month, rather than a 6-month, period, based on the court's calculation of lost profits. The plaintiff also cross-appeals from so much of the amended judgment as did not double the award of attorneys' fees in compliance with the terms of the PSA.
"Under New York common law, a seller has an 'implied covenant' or 'duty to refrain from soliciting former customers, which arises upon the sale of the "good will" of an established business'" (Bessemer Trust Co., N.A. v Branin, 16 NY3d 549, 556, quoting Mohawk Maintenance Co. v Kessler, 52 NY2d 276, 283). "[U]pon the sale of 'good will,' a 'purchaser acquires the right to expect that the firm's established customers will continue to patronize the business'" (Bessemer Trust Co., N.A. v Branin, 16 NY3d at 557, quoting Mohawk Maintenance Co. v Kessler, 52 NY2d at 285). "This is so because '[t]he essence of [these types of] transaction[s] is, in effect, an attempt to transfer the loyalties of the business' customers from the seller, who cultivated and created them, to the new proprietor'" (Bessemer Trust Co., N.A. v Branin, 16 NY3d at 557, quoting Mohawk Maintenance Co. v Kessler, 52 NY2d at 285).
Notwithstanding such a covenant, "the customers [and clients] of the acquired business, 'as a consequence of the change in ownership,' may choose to take their patronage elsewhere" (Bessemer Trust Co., N.A. v Branin, 16 NY3d at 557, quoting Mohawk Maintenance Co. v Kessler, 52 NY2d at 285). To militate against these risks, which extend beyond the limited scope of a seller's implied covenant, a purchaser may negotiate an express covenant reasonably restricting the seller's general right to compete (see Bessemer Trust Co., N.A. v Branin, 16 NY3d at 557). The modern cases favor according such covenants full effect, if not unduly burdensome, in cases where the agreement in question is made in connection with the sale of a business and its good will (see Mohawk Maintenance Co. v Kessler, 52 NY2d at 284). In such cases, the sole limitation on the [*3]enforceability of such a covenant is that its duration and scope be reasonably necessary to protect the buyer's legitimate interest in the purchased asset (see Hadari v Leshchinsky, 242 AD2d 557, 558; see also Mammolito v McHugh, 8 AD3d 537).
"There is no hard and fast rule in determining whether a seller of 'good will' has improperly solicited his [or her] former clients" (Bessemer Trust Co., N.A. v Branin, 16 NY3d at 557). Rather, in making this assessment, the "trier of fact ought to consider whether, following the sale of a business and its good will, a seller initiated contact with his former customers or clients" (id.). However, "not all discussions between a seller and former client are impermissible" provided that the seller is not actively soliciting business from the former customer or client (id. at 558).
"A covenant against competition must be construed strictly and should not be extended beyond the literal meaning of its terms" (Elite Promotional Mktg., Inc. v Stumacher, 8 AD3d 525, 526; see Gramercy Park Animal Ctr. v Novick, 41 NY2d 874, 874). "The restraint must be reasonable such that it 'is no greater than is required for the protection of the legitimate interest' of the party seeking enforcement" (Elite Promotional Mktg., Inc. v Stumacher, 8 AD3d at 526, quoting BDO Seidman v Hirshberg, 93 NY2d 382, 388 [emphasis omitted]).
"Implicit in the sale of a business, unless expressly reserved, is the sale of its 'good will'" (Borne Chem. Co. Inc. v Dictrow, 85 AD2d 646, 647; see Meteor Indus. v Metalloy Indus., 149 AD2d 483, 486). "Further, 'the existence of [a] noncompetition agreement [is] evidence that 'good will' [is] intended to be transferred and require[s] protection'" (Meteor Indus. v Metalloy Indus., 149 AD2d at 486, quoting Delta Resources, Inc. v Harkin, 118 AD2d 133, 138; see Mohawk Maintenance Co. v Kessler, 52 NY2d at 282-284). The proper measure of damages for breach of a covenant not to compete is the lost profits of which the plaintiff was deprived by reason of the defendant's improper competition (see Hunts Point Realty Corp. v Pacifico, 56 AD3d 721; Earth Alternations, LLC v Farrell, 21 AD3d 873, 874; Pencom Sys. v Shapiro, 193 AD2d 561). A plaintiff has the burden of proving net lost profits due to the defendant's competition (see Borne Chem. Co. v Dictrow, 85 AD2d at 651). Anticipated lost profits cannot be based on speculation (see Goodstein Constr. Corp. v City of New York, 80 NY2d 366, 374; Hunts Point Realty Corp. v Pacifico, 56 AD3d at 721-722).
Here, in moving for summary judgment, the defendant established his prima facie entitlement to judgment as a matter of law dismissing the complaint and on his counterclaim. However, in opposition, the plaintiff raised triable issues of fact such that the Supreme Court properly denied the defendant's motion for summary judgment (see Mammolito v McHugh, 8 AD3d 537; Meteor Indus. v Metalloy Indus., 104 AD2d 440). Since triable issues of fact existed warranting a trial on the issues presented by all three causes of action, we agree with the court's determination denying the defendant's motion for summary judgment dismissing the complaint and on his counterclaim for attorneys' fees.
We disagree with the Supreme Court's sua sponte determination that the provision of the PSA, which, in the event of litigation, allows for a recovery of double the amount of attorneys' fees expended by the substantially prevailing party, is an unenforceable penalty. When parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms (see Vermont Teddy Bear Co. v 538 Madison Realty Co., 1 NY3d 470, 475). Paragraph 10.11 of the PSA clearly sets forth the intent of the parties, two sophisticated businesspeople with the benefit of counsel, that, should litigation arise out of the PSA, the "substantially prevailing party" is entitled to two times reasonable attorneys' fees. Where, as here, "there is no deception or overreaching" in the making of such agreement, the agreement should be enforced as written (Lawrence v Graubard Miller, 11 NY3d 588, 596 n 4; see White Plains Plaza Realty, LLC v Town Sports Intl., LLC, 79 AD3d 1025, 1028; Glen Banks, New York Contract Law § 22:42 [28 West's NY Prac Series Aug. 2020 Update]). Moreover, while each party asserted in the Supreme Court, and asserts on appeal, that he should prevail and be treated as the prevailing party for the purpose of paragraph 10.11, neither party contended in the Supreme Court that the double attorneys' fees provision of paragraph 10.11 should not be enforced.
When reviewing a determination made after a nonjury trial, this Court's authority is as broad as that of the trial court, and this Court may render the judgment it finds warranted by the facts, taking into consideration that, in a close case, the trial court had the advantage of seeing and hearing the witnesses (see Northern Westchester Professional Park Assoc. v Town of Bedford, 60 NY2d 492, 499; Schulman Family Enters. v Schulman, 167 AD3d 959, 960).
Here, the Supreme Court's determination in its August 2017 decision after trial that the defendant violated the covenant not to compete was warranted by the facts. The evidence the plaintiff presented at trial established that the defendant violated the covenant not to compete, reflecting, inter alia, that the defendant's work for Springleaf involved corporate restructuring which would be in violation of the covenant not to compete, that Springleaf was in financial distress, and that the defendant's acceptance of employment at Springleaf usurped the plaintiff's opportunity for similar employment. We see no basis to disturb the court's conclusion that the email correspondence reflecting the defendant's audition for Springleaf, the workstream overview describing his responsibilities, the limited duration of services, and the substantial compensation earned by the defendant all establish that the defendant's work involved corporate restructuring in violation of the covenant not to compete. That Springleaf chose to hire the defendant as an employee, rather than retain him as consultant, is simply a matter of form and does not exonerate the defendant from his breach of the restrictive covenants.
However, the award of $825,000 in damages cannot be sustained. The evidence offered at trial does not support the assumptions upon which the Supreme Court's damages calculations rests. There is no evidentiary basis upon which it may be concluded that the Corporation would have been paid a monthly gross fee equal to the amount paid by Capmark to the Corporation, that services would have been provided, and payment made, for six months, and that the Corporation would have realized a 50% profit. There is similarly no evidentiary basis upon which it may be concluded that, alternatively, using the valuation method set forth by the plaintiff, services would have been provided, and payment made, for 21 months. An award of damages on either theory espoused by the plaintiff would not be based on known reliable factors and would be unduly speculative (see Kenford v Co. of Erie, 67 NY2d 257, 261).
Nevertheless, because the plaintiff has established the defendant's liability by demonstrating that the defendant breached the covenant not to compete, the plaintiff is entitled to nominal compensatory damages (see Kronos, Inc. v AVX Corp., 81 NY2d 90, 95; Magu Realty Co. v Spartan Concrete Corp., 239 AD2d 469, 470; Hirsch Elec. Co. Inc. v Community Servs., 145 AD2d 603, 605; Clearview Concrete Prods. Corp. v S. Charles Gherardi, Inc., 88 AD2d 461, 470). Since the plaintiff established the defendant's liability and the plaintiff is entitled to nominal damages, we conclude that is it appropriate to characterize the plaintiff as the substantially prevailing party for the purpose of paragraph 10.11 of the PSA. Therefore, the plaintiff is entitled recover the costs and expenses of this litigation, including two times reasonable attorneys' fees as provided in the PSA. The requirement that the party seeking fees be the party who substantially prevailed does not mean that the party's monetary recovery must be substantial. A party may be considered to have substantially prevailed where the party prevailed on the merits of the case even though the party could not prove compensatory damages (see Signature Flight Support Corp. v Landow Aviation Ltd. Partnership, 730 F Supp 2d 513 [ED Va]).
We respectfully disagree with our dissenting colleague's assertion that the plaintiff is not the substantially prevailing party in connection with paragraph 10.11 of the PSA, and submit that the cited case law is distinguishable as to the facts presented on these appeals and cross appeals. Nestor v McDowell (81 NY2d 410, 416) involved an ejectment proceeding concerning a rent-stabilized apartment, and held that attorneys' fees were not warranted "under the facts and circumstances of this case," wherein the plaintiff had failed to obtain a possessory judgment. O'Donnell v JEF Golf Corp. (173 AD3d 1528, 1532) is similarly inapposite, and involved a golf course's failure to provide a groundskeeper with a wage statement notice pursuant to Labor Law § 195(3). In Village of Hempstead v Taliercio (8 AD3d 476, 476), an award of attorneys' fees to the plaintiff was held to be unwarranted because the subject house alleged to be operating as an illegal rooming house had been sold, rendering the action for permanent injunctive relief "academic." Here, [*4]notwithstanding the plaintiff's inability to establish a nonspeculative basis for the imposition of significant compensatory damages, it is our view that the plaintiff substantially prevailed by establishing that the defendant breached the PSA.
Accordingly, we modify the amended judgment by deleting the provision thereof awarding the plaintiff damages in the principal sum of $825,000 and substituting therefor a provision awarding the plaintiff nominal damages, and by deleting the provision thereof awarding the plaintiff attorneys' fees in the principal sum of $755,160; we otherwise affirm the amended judgment insofar as appealed and cross-appealed from; and we remit the matter to the Supreme Court, Nassau County, for a hearing and a new determination on the issue of the award to the plaintiff of the costs and expenses of litigation, including two times reasonable attorneys' fees, pursuant to paragraph 10.11 of the PSA and for the entry of an appropriate second amended judgment thereafter.
The parties' remaining contentions either are without merit or need not be reached in light of our determination.
SCHEINKMAN, P.J., CHAMBERS and MILLER, JJ., concur.
AUSTIN, J., concurs in part and dissents in part, and votes to grant the motion to dismiss the appeal from the order, to dismiss the appeal from the order, to dismiss the appeal and the cross appeal from the judgment, to reverse the amended judgment insofar as appealed from, on the law and the facts, to dismiss the complaint, to find in favor of the defendant on his counterclaim, to remit the matter to the Supreme Court, Nassau County, for a determination on the amount of the defendant's attorneys' fees pursuant to the parties' agreement of purchase and sale of stock and for the entry of an appropriate second amended judgment in favor of the defendant on his counterclaim thereafter, and to affirm the amended judgment insofar as cross-appealed from, with the following memorandum:
On these appeals and cross appeals, I concur with the majority's determination that the Supreme Court properly denied the defendant's motion for summary judgment dismissing the complaint and on his counterclaim for the reasons set forth by my colleagues. Additionally, I agree that the court erred in sua sponte finding that the parties' agreement to allow double attorneys' fees to the substantially prevailing party in the event litigation arose from the subject agreement was an unenforceable penalty. Moreover, I agree that the damages award of $825,000 cannot be sustained since such valuation was based upon undue speculation and concur with the majority's, in effect, rejection of the plaintiff's contention that he should have been awarded reliance damages as opposed to lost profits, or, in the alternative, for 21 months of lost profits rather than 6 months, using the valuation formulated by the court.
We differ, however, as to which party prevailed after trial and as to whether, even if the plaintiff did prevail, he could be considered the substantially prevailing party to justify an award of double attorneys' fees. That is, I dissent from the majority's determination that, at trial, the plaintiff demonstrated that the defendant breached the covenant not to compete set forth in the agreement entered into between the parties or that he was the substantially prevailing party at the conclusion of this litigation. The determination of the Supreme Court, after a nonjury trial, as affirmed by my colleagues in the majority, is not warranted by the facts or supported by the record before us and should be reversed and the defendant awarded attorneys' fees under his counterclaim as the substantially prevailing party.
A. Background
Until October 2011, the parties were equal partners in a management consulting firm, Loughlin Meghji & Co. Associates, Inc. (hereinafter the Corporation), which focused on corporate restructuring. In October 2011, the plaintiff purchased the defendant's interest, inter alia, in the Corporation pursuant to an "Agreement of Purchase and Sale of Stock" (hereinafter PSA). The PSA contained, among other things, a covenant not to compete with the Corporation for the two-year period following the plaintiff's purchase of the defendant's interest in the Corporation.
Subsequently, in December 2014, the plaintiff commenced this action against the defendant [FN1] to, inter alia, recover damages for breach of the covenant not to compete with the Corporation's business in violation of paragraph 9.1.1 of the PSA (second cause of action). Specifically with respect to the second cause of action, in his complaint, the plaintiff sought to recover "all payments made by [him] to [the defendant] under the [PSA]; [ ] all sums realized by [the defendant] on account of his employment by [his subsequent employer]; and a declaration that [he] ha[d] no further obligations to [the defendant] with respect to payment of the Purchase Price."[FN2] The plaintiff also sought an award of attorneys' fees pursuant to paragraph 10.11 of the PSA (third cause of action). In his answer, the defendant asserted a counterclaim for an award of attorneys' fees in accordance with paragraph 10.11 of the PSA.
After the defendant's motion for summary judgment dismissing the complaint and on his counterclaim was denied, the matter proceeded to trial before the Supreme Court. During trial, as witnesses, the plaintiff called the defendant, an expert business appraiser who opined as to the valuation of the covenant not to compete as of the closing date and which was used for income tax purposes, and himself. For his case-in-chief, the defendant called the CEO of his subsequent employer, an executive vice president and chief legal officer of his subsequent employer, an expert on corporate restructuring, and himself. By decision after trial entered August 22, 2017, the court found in favor of the plaintiff on the second cause of action, determining that the defendant violated the covenant not to compete based on email correspondence between the defendant and the CEO of his subsequent employer prior to his hire, a document entitled "Workstream Overview," the limited duration of the defendant's employment with his subsequent employer, and the amount of compensation he earned during his employment there.
While the Supreme Court concluded that the defendant violated the covenant not to compete, with respect to the amount of damages suffered by the plaintiff, the court rejected the plaintiff's attempt to measure his damages for the defendant's breach as being equal to the amount of compensation earned by the defendant while employed by his subsequent employer or, in effect, by any measurement other than lost profits. Instead, the court calculated the plaintiff's damages based upon an amount the Corporation earned for an unrelated engagement undertaken by the defendant while he still had an interest in the Corporation. In addition, the court specifically found that the "[p]laintiff offered no evidence that [the] defendant impaired the goodwill or general profitability of [the Corporation] by violating the covenant not to compete" so that the plaintiff remained liable for all payments on the promissory note related to the plaintiff's purchase of the Corporation [FN3]. Based upon its damages calculation, the court found that the plaintiff was the [*5]"prevailing party."
In a subsequent decision entered November 14, 2017, the Supreme Court found that the plaintiff, as "a 'prevailing party,'" was entitled to recover attorneys' fees pursuant to the PSA in the amount of $755,160.
B. Standard of Review
When reviewing a determination made after a nonjury trial, this Court's authority is as broad as that of the trial court, and this Court may render the judgment it finds warranted by the facts, taking into consideration that, in a close case, the trial court had the advantage of seeing and hearing the witnesses (see Northern Westchester Professional Park Assoc. v Town of Bedford, 60 NY2d 492, 499; Cathedral Props. Corp. v Cathedral Ct. Assoc., L.P., 177 AD3d 843, 847; Schulman Family Enters. v Schulman, 167 AD3d 959, 960).
C. Breach of the Covenant Not to Compete
"A covenant against competition must be construed strictly and should not be extended beyond the literal meaning of its terms" (Elite Promotional Mktg., Inc. v Stumacher, 8 AD3d 525, 526; see Gramercy Park Animal Ctr. v Novick, 41 NY2d 874, 874). "The restraint must be reasonable such that it 'is no greater than is required for the protection of the legitimate interest' of the party seeking enforcement" (Elite Promotional Mktg., Inc. v Stumacher, 8 AD3d at 526, quoting BDO Seidman v Hirshberg, 93 NY2d 382, 388).
"The proper measure of damages for breach of a covenant not to compete is the net profit[s] of which the plaintiff[ ] w[as] deprived by reason of the defendant's improper competition" (Hunts Point Realty Corp. v Pacifico, 56 AD3d 721, 721; see Earth Alterations, LLC v Farrell, 21 AD3d 873, 874; see also Pencom Sys., Inc. v Shapiro, 193 AD2d 561, 561). The plaintiff has the burden of proving net lost profits due to the defendant's improper competition (see Borne Chem. Co. v Dictrow, 85 AD2d 646, 651).
1. The Parties' Contentions with Respect to the Supreme Court's Finding that the Defendant Breached the Covenant Not to Compete
On appeal, the defendant contends that the plaintiff failed to establish by a preponderance of the evidence that the defendant violated the covenant not to compete. The defendant asserts that the evidence demonstrated that he did not provide consulting services to his subsequent employer, Springleaf Finance, Inc. (hereinafter Springleaf), with regard to corporate restructuring and that there was no evidence that he, as a Springleaf employee, was providing services to Springleaf in the manner which the Corporation would have provided to Springleaf if so engaged.
The defendant contends that the plaintiff presented no evidence to show that there was a fundamental change in Springleaf's debt or equity, which is a key aspect of restructuring as provided by the Corporation when engaged, while, conversely, he was a member of Springleaf's senior management team. The defendant argues that the type of internal corporate reorganization undertaken by Springleaf, in the form of decisions to cease operations on the mortgage side of its business and close branch offices, did not demonstrate a fundamental change in Springleaf's debt or equity.
Moreover, the defendant claims that the plaintiff's contention that Springleaf's internal reorganization constituted a corporate restructuring is a red herring because the two [*6]decisions which the plaintiff asserted indicated that Springleaf was undergoing a corporate restructuring were made prior to the defendant's employment by Springleaf and implemented without any involvement by him. In addition, the defendant asserts that the general business goals of reducing costs and increasing profitability did not amount to corporate restructuring as that term applied to the Corporation's business as of May 2011 and the corporate restructuring business generally.
Further, the defendant maintains that the evidence did not demonstrate that Springleaf ever hired anyone to act as a chief restructuring officer despite the existence of a draft document entitled "Workstream Overview," the authorship of which was unknown, but which was created prior to the defendant's employment. The defendant argues that it was error for the Supreme Court to have admitted this document since it was inadmissible hearsay. He maintains that his ambiguous email response of "will do" in response to receipt of an email to which the Workstream Overview was attached did not rise to the level of an adoptive admission. The defendant also maintains that emails sent prior to his being hired by Springleaf which reference his background in corporate restructuring were not evidence of the work he actually did at Springleaf.
The defendant asserts that the interpretation of the covenant not to compete which the plaintiff propounded during trial would have barred the defendant from accepting any employment as a senior manager in any company for the two-year period following his sale of his stock in the Corporation to the plaintiff. The defendant contends that, if such an expansive reading is adopted, then the enforcement of that covenant was unreasonable because the restraint went beyond protecting the plaintiff's legitimate business interest against competition by unreasonably expanding the definition of "corporate restructuring."
In response, the plaintiff asserts that the defendant concedes that Springleaf employed him to enhance operational performance by restructuring the company, that the emails sent prior to the defendant being hired demonstrated that the defendant was hired because of his corporate restructuring experience, and that the Workstream Overview shows that the defendant was hired as Springleaf's chief restructuring officer, a fact which the defendant accepted by failing to object to the Workstream Overview upon his receipt of same on January 17, 2012, his second day of work. The plaintiff further maintains that the defendant's compensation package of a base salary plus stock valued at $15 million, which was not similar to the packages received by any of the other members of the management team except for Springleaf's two most senior officers, then-CEO Jay Levine and John Anderson, an executive vice president who was head of capital markets at the time of the defendant's hire and chief legal officer, demonstrated that the defendant was providing restructuring services while at Springleaf. The plaintiff also maintains that the defendant's limited term of employment also supports his position that the defendant was providing services to Springleaf in violation of the covenant not to compete. Moreover, the plaintiff contends that the defendant's responsibilities at Springleaf were comparable to those he performed on behalf of the Corporation to Capmark Financial Group, Inc. (hereinafter Capmark), a commercial mortgage origination and servicing company at a time when Levine served as the CEO of that entity and then later as an advisor.
The plaintiff asserts that it did not matter whether Springleaf was in financial distress at the time that it hired the defendant in order to determine whether the defendant competed with the Corporation by providing operational restructuring and performance improvement services because the covenant not to compete was not limited to a prohibition against the defendant providing consulting restructuring services. The plaintiff claims that since the defendant engaged in business activities that competed directly or indirectly with the type of business the Corporation operated as of May 2011, the defendant violated the covenant not to compete by depriving the plaintiff of the opportunity for Springleaf to engage the services of his newly formed corporation, Loughlin Management Partners & Company, Inc. (hereinafter Loughlin Management).
2. The Supreme Court, after trial, Improperly Found that the Defendant Breached the Covenant Not to Compete
Contrary to the finding of the Supreme Court and my colleagues in the majority, the evidence, beyond the plaintiff's surmise and conjecture, did not support a determination that the defendant breached the covenant not to compete against the Corporation for a two-year period subsequent to selling his shares in the Corporation to the plaintiff. The covenant not to compete restricted the defendant from "engag[ing] in the business of providing consulting services in connection with corporate restructurings . . . or otherwise engag[ing] in business activities that directly or indirectly compete with the business of the Corporation as of May 10, 2011" (PSA Article 9.1[1]). The restriction was specifically not intended to restrict the defendant from "engaging in any activities . . . that at the time such activities are undertaken . . . do not compete with the business of the Corporation as of such time" (PSA Article 9.1).
According to paragraph seven of the complaint, "[a]t all relevant times herein, [Loughlin Management, formerly the Corporation,] was and is in the business of providing consulting services in connection with corporate restructurings" (emphasis added). With respect to the second cause of action, breach of the covenant not to compete, the plaintiff alleged that, "in or about January 2012, [the defendant] breached the [covenant not to compete] by accepting employment with Springleaf as Executive Vice President and Head of Strategy and Corporate Development with responsibility for advising Springleaf as to its corporate restructuring" (emphasis added). The plaintiff further alleged that the defendant "rendered services to Springleaf similar to the services [Loughlin Management, formerly the Corporation,] would have rendered if Springleaf had retained [Loughlin Management, formerly the Corporation,] as a consultant in connection with Springleaf's corporate restructuring and therefore has acted in competition with the business of [Loughlin Management, formerly the Corporation]" (emphasis added).
The plaintiff never amended his pleadings to incorporate an allegation that the defendant breached the covenant not to compete because he was providing services to Springleaf, other than those related to corporate restructuring, which directly or indirectly competed with the newly formed Loughlin Management's business or that of the Corporation. Only at the time of trial did the plaintiff's counsel attempt to assert that the covenant not to compete was breached by the defendant providing services other than those involving corporate restructuring, while the plaintiff himself testified, on direct examination, consistent with his deposition testimony, that he believed that the defendant violated the covenant not to compete when he provided "the same type of turnaround and restructuring advisory services that [the Corporation] did."
Significantly, on cross-examination, the plaintiff responded "[c]orrect" when asked if the defendant "didn't perform any restructuring services for [Springleaf], he wouldn't be violating the [covenant not to compete]." Further, the evidence which the plaintiff presented at trial did not establish that the defendant provided the same restructuring services to Springleaf as Loughlin Management/the Corporation could have provided at the time of the alleged breach.
Further, the plaintiff's contention that the defendant's compensation from Springleaf demonstrated that he was performing restructuring services in violation of the covenant not to compete is misguided. The plaintiff's testimony and hypothesis did not allow for a recognition of the defendant's experience and ability in the field of corporate governance. Similarly, the plaintiff's contention that the services the defendant provided at Capmark were akin to the responsibilities he had as an employee of Springleaf is not borne out by the record inasmuch as the defendant served as the Chairman and CEO of two related insurance companies in addition to performing his Springleaf managerial duties.
In its first decision after trial, the Supreme Court found that the evidence demonstrated that the defendant's work for Springleaf involved corporate restructuring which would be in violation of the covenant not to compete. However, evidence was presented which demonstrated that the term "restructuring" was used in two different contexts. The first context was the general sense of the word which had no industry-wide or term of art connotation. As an example of the general use of the word, the defendant's expert testified "[y]ou know, if you replace the phone operator, well, you've restructured the organization." He further explained that this understanding of restructuring was different from the industry understanding where "[w]e're talking about something fundamental that is done in order to preserve the company." The defendant's expert [*7]agreed with the definition of restructuring the court used in its order denying the defendant's motion for summary judgment in which the court explained that the term indicated "a fundamental change in the equity and/or debt of the company." Contrary to the court's finding, the evidence did not show that the defendant, as Springleaf's Executive Vice President/Head of Strategy and Corporate Development, or as Chairman and CEO of Merritt Life and Yosemite Life, two insurance companies that Springleaf owned, provided corporate restructuring services to Springleaf as that term was defined by the turnaround and corporate restructuring industry.
Although the facts that Levine sent emails prior to the defendant being hired by Springleaf in which Levine mentioned the defendant's background in the restructuring industry and the defendant did not disclose the subject covenant not to compete in his Springleaf employment application may appear troubling at first, these facts do not have any bearing on what services the defendant provided to Springleaf to demonstrate that he was providing "corporate restructuring" services to Springleaf in competition with Loughlin Management's business. As "proof" that the defendant performed restructuring services to Springleaf in violation of the covenant not to compete, the plaintiff relies on decisions that were made to close the mortgage stream of Springleaf's business and to shutter branch offices. However, those decisions were made before the defendant started working at Springleaf and, in any event, did not appear to constitute part of a corporate restructuring as that term is understood and used in the turnaround and corporate restructuring industry.
Further, the plaintiff submitted absolutely no direct evidence showing exactly what work the defendant performed while at Springleaf which demonstrated, or even implicated, a violation of the covenant not to compete, as opposed to merely pointing to the fact that the defendant was given $15 million in restricted stock as part of his compensation package and surmising that this indicated that the defendant must have been performing corporate restructuring activities [FN4]. Nor did the plaintiff submit any documentary evidence or call any witness, such as an employee from Springleaf or its primary shareholder, Fortress Investment Group, LLC (hereinafter Fortress), to show that the defendant competed with Loughlin Management by working as a member of Springleaf's senior management team. Such conjecture cannot support the plaintiff's claim that the defendant violated the covenant not to compete.
In addition, the plaintiff's testimony was clear that he was not aware of Springleaf prior to the defendant mentioning the company during a deposition given in an unrelated action commenced by the defendant against the plaintiff with respect to compensation owed to the defendant pursuant to the terms of the PSA [FN5]. The plaintiff did not, and could not, establish that either Levine or Springleaf had been customers of the Corporation. Indeed, the plaintiff admitted that neither Levine nor Springleaf were ever clients of the Corporation, and that Loughlin Management never solicited business from Springleaf or Levine. Nor did he testify that he was aware of any relationship between Springleaf and Capmark or that Springleaf was on a "watch list" [*8]compiled by the Corporation or Loughlin Management for the purpose of identifying companies in need of restructuring services. Moreover, Levine testified that, while he was Capmark's CEO, the Corporation was hired by Capmark after he had been introduced to the defendant and Capmark had been advised by its banks to hire a restructuring firm, that the defendant was the lead professional from the Corporation who worked on the Capmark engagement resulting in Levine and the defendant working closely together during that two-year period, and Levine did not know the plaintiff. Thus, it was entirely speculative for the Supreme Court to assume that Springleaf would have reached out to Loughlin Management if the defendant had turned down the management role especially since the plaintiff failed to point to any admissible evidence which supports his position that Springleaf would have retained Loughlin Management but for the defendant's employment and had, in response to a notice dated May 26, 2015, in which he was asked to admit that he was "not seeking any lost profit damages in this action," responded that he did not "intend to offer proof at trial that Springleaf or its affiliated companies would have hired [Loughlin Management] but for its employment of [the d]efendant." Speculation cannot substitute for evidence which connects the dots of a prima facie showing of breach.
Moreover, although Springleaf had engaged Houlihan Lokey Capital to provide for financial consulting services, prior to Levine's tenure as its CEO, which had previously represented the creditors committee of Capmark, and sought potential counsel from Dewey & LeBoeuf, which had also been engaged by Capmark while Levine was CEO, there is no indication that Levine would have contacted the plaintiff, with whom Levine did not have any relationship, to talk about staffing a senior management position at Springleaf, such as the role filled by the defendant; a role for an individual which would not have been filled by Loughlin Management, a consulting firm.
Despite the plaintiff's reliance on the Workstream Overview which indicated that potentially a "Chief Restructuring Officer" was hired by Springleaf on January 16, 2012, the same day that the defendant started work at Springleaf, this document also does not demonstrate anything with respect to the work actually performed by the defendant while employed by Springleaf. Moreover, the Supreme Court erred in admitting the Workstream Overview into evidence over the defendant's objection based on the plaintiff's argument that the document was admissible as an adoptive admission.
Prior to trial, the defendant moved to preclude the plaintiff from offering the Workstream Overview into evidence. In an order entered June 5, 2017, the Supreme Court denied the defendant's motion in limine, finding that the Workstream Overview was "an admission which, subject to proper authentication, [was] admissible at trial." The Workstream Overview was never properly authenticated during trial.
In the context of a criminal case, the Court of Appeals has described an "adoptive admission" as occurring "'when a party acknowledges and assents to something "already uttered by another person, which thus becomes effectively the party's own admission"'" (People v Vining, 28 NY3d 686, 690, quoting People v Campney, 94 NY2d 307, 311, quoting 4 Wigmore Evidence § 1609 at 100 [Chadbourn rev.] [emphasis omitted]). The Vining Court further explained that "[a]ssent can be manifested by silence, because '[a] party's silence in the face of an accusation, under [the] circumstances that would prompt a reasonable person to protest, is generally considered an admission'" (People v Vining, 28 NY3d at 690, quoting Robert A. Barker & Vincent C. Alexander, Evidence in New York State and Federal Court § 8:17 [West's NY Prac. Series Nov. 2016 Update]). However, the Court warned that it "recognize[d] that evidence of a party's silence or evasiveness can have 'minimal probative significance' and a 'substantial' risk of prejudice" (People v Vining, 28 NY3d at 690-691, quoting People v Conyers, 52 NY2d 454, 458-459).
In the civil context, "[s]tatements made by a person . . . may be considered as adoptive admissions if the direct or circumstantial evidence clearly indicates that the party acknowledge[d] and assents to such statements" (Matter of Seventh Jud. Dist. Asbestos Litig., 2 Misc 3d 518, 524 [Sup Ct, Monroe County]).
Here, the January 17, 2012, email from the defendant stating "[t]hanks, will do" [*9]which he sent to Peter Sheean, a junior associate at Fortress, at psheean&commat;fortress.com, in response to an email which Sheean had forwarded to the defendant with the subject line "Updated Workstream Document Attached" and the following message "Mo-wanted to be sure you receive as well. Please let me know if you have any edits, suggestions, thoughts that may make sense. Thanks, Peter," does not clearly indicate that the defendant acknowledged and assented to any of the statements in the attached Workstream Overview document. When questioned about whether he read the Workstream Overview attached to Sheean's email, the defendant responded, "I don't recall specifically doing that." When plaintiff's counsel pressed the defendant as to how he could not read this "important" document, sent on his second day of employment, which was also received by Levine and Anderson, the defendant responded, "So there were a lot of documents like this floating around, and I was—again, from general recollection, in my first couple of days I was attending a lot of meetings, figuring out the business. The person [who] prepared this document was a junior associate at Fortress who was simply loaned to Springleaf to help draft documents. It wasn't like I had to drop everything and look at this."
The defendant also explained that "[t]here were many versions of this document" and that the subject document marked in evidence looked familiar "in terms of [him] having seen various iterations." However, the defendant was not sure that he saw the version which was marked as an exhibit at trial. He also did not know who authored the document. Consequently, there was no way of knowing if the person who authored the document had the authority to make any of the statements contained in the document (see e.g. Fruin-Colnon Corp. v Niagara Frontier Transp. Auth., 180 AD2d 222, 234). The defendant also explained that the document contained many inaccuracies as to how Springleaf actually operated. Further, Sheean's email forwarding the document did not directly or indirectly seek the defendant's approval or agreement; just his edits, suggestions, and thoughts.
In support of his position that the Workstream Overview was admissible as an adoptive admission, the plaintiff relied upon Jerome Prince, Richardson on Evidence § 8-223 (Farrell 11th ed). However, an "admission by silence" pertains only to those situations where "[s]ilence, when one would naturally be expected to speak, is often as significant as an express admission" (Jerome Prince, Richardson on Evidence § 8-223). Silence is only deemed an admission "[i]f a party fails to deny a statement made in his presence, under such circumstances that the party heard and fully understood what was said, and had an opportunity to reply, and would naturally have denied the statement had he regarded it as untrue" (id.). In that case, "the statement, together with the fact of silence, is admissible in evidence on the theory that the party's silence was, under the circumstances, a tacit admission of the truth of the statement" (id.). The attachment of a document in which it was indicated that the "milestone" of "Hire [Chief Restructuring Officer]" was "completed [on] Jan 16" and the defendant was assigned to certain "operational restructuring" tasks along with "Alvarez"[FN6] to meet certain goals, to an email is not the type of circumstance where the defendant "would naturally have denied the statement" and necessarily where he was given an opportunity to respond with anything more than ideas relating to it.
Consequently, it was improper for the Supreme Court to accept a draft document without proof of authorship, as to which there was no evidence of its implementation and which is belied by the defendant's actual duties and responsibilities while employed by Springleaf.
In Reed, Roberts Assoc. v Strauman (40 NY2d 303), relying on the view that "judicial disfavor of the[ ] covenants [not to compete] is provoked by 'powerful considerations of public policy which militate against sanctioning the loss of a [person's] livelihood,'" the Court of Appeals found that a senior vice president overseeing the plaintiff's operations and corporate policy was not so unique that he could not open his own company in direct competition to the plaintiff's business [*10]notwithstanding a three-year non-competition agreement (Reed, Roberts Assoc. v Strauman, 40 NY2d at 307, quoting Purchasing Assoc. v Weitz, 13 NY2d 267, 272). The Court of Appeals noted that the plaintiff was more concerned with protecting the "intricacies of their business operation" which was known to the defendant (Reed, Roberts Assoc. v Strauman, 40 NY2d at 309). However, the Reed Roberts Court found that "absent any wrongdoing, we cannot agree that [the defendant] should be prohibited from utilizing his knowledge and talents in this area. A contrary holding would make those in charge of operations or specialists in certain aspects of an enterprise virtual hostages of their employers" (id. [citation omitted]). Simply put, a departing employee does not leave as a tabula rasa. His or her experience and business acumen go with him or her.
Here, the plaintiff focuses on the fact that the Springleaf and Fortress executives discussed the defendant's experience before hiring him as a very high level employee as evidence that the defendant was competing with Loughlin Management. However, if there was absence of such discussion with respect to the qualifications of a potential hire for the position for which the defendant was hired, such a hiring process would be an anomaly. It is apparent that the defendant's many years of experience came from the area of corporate restructuring. To find that any discussion of his qualifications during the hiring process rendered him in competition with his former partner fails to take into consideration the common sense practice of hiring a senior executive. The process of which the plaintiff complains had no demonstrable impact on the plaintiff's business or enabled the defendant to unfairly compete (see Columbia Ribbon & Carbon Mfg. Co., Inc. v A-1-A Corp., 42 NY2d 496, 499).
Moreover, the defendant was held liable for taking employment with an entity which was a stranger to the plaintiff, not a competitor, and which was already utilizing the services of a direct competitor of the plaintiff; to wit: A & M, and, as the majority finds, for which the plaintiff admitted he sustained no identifiable damages—lost profits or otherwise. Simply put, there is not, nor can there be, any reasonable view of the evidence which would enable a finding that beyond the defendant's use of his corporate experience and expertise, his employment with Springleaf was, in any way, competitive with the plaintiff's corporate restructuring business. The absence of damages is a clear indicator that, on this record, the plaintiff failed to prove beyond conjecture that the defendant breached the covenant not to compete.
In addition, as noted by the majority, "'the existence of [a] noncompetition agreement [i]s evidence that "good will" [i]s intended to be transferred and require[s] protection'" (Meteor Indus. v Metalloy Indus., 149 AD2d 483, 486, quoting Delta Resources, Inc. v Harkin, 118 AD2d 133, 138). However, here, the Supreme Court made a finding that the plaintiff failed to offer any evidence that the defendant impaired the Corporation's good will by violating the covenant not to compete. Thus, since a noncompetition agreement is intended to protect the good will of a business upon its sale, where, as here, there is no evidence that the business's good will has been impaired, a finding that the noncompetition agreement has been breached is incongruous.
The plaintiff failed to meet his burden of proving that the defendant violated the covenant not to compete, which did not expressly or implicitly prohibit employment that did not encompass or compete with the plaintiff's business. As opposed to the defendant who presented expert testimony on the difference between restructuring in the generic sense versus the term of art "corporate restructuring," the plaintiff presented no such evidence. The majority's view that, in essence, the defendant was competing in a different form is not borne out by the evidence. Based on the plaintiff's description of what type of activities would be in competition with the business of Loughlin Management, it would be any activities where a company seeks to maximize profit and reduce debt. Such cannot be the standard. Thus, the plaintiff's claim of the defendant's competition was long on conjecture and speculation and short on testimonial and documentary evidence that there was any violation of the covenant not to compete and, if there were any, that such violation was harmful to the plaintiff.
Accordingly, the Supreme Court should have found that, in the totality of the evidence presented at the trial, the plaintiff failed to adduce any admissible evidence that the defendant breached the covenant not to compete and dismissed the complaint in its entirety in [*11]addition to finding for the defendant, as the substantially prevailing party, on his counterclaim for attorneys' fees in compliance with the contract provision allowing for such recovery.
Further, by expanding the covenant not to compete to include a limitation on employment such as that which the defendant accepted with Springleaf, the Supreme Court and the majority have impermissibly modified an unambiguous contract clause (see Vermont Teddy Bear Co., Inc. v 538 Madison Realty Co., 1 NY3d 470, 475; Jordan v Benjamin-Beechwood Dune, 178 AD3d 904).
D. Attorneys' Fees
I agree that, if the plaintiff had demonstrated that the defendant breached the covenant not to compete, which he did not, the plaintiff would be entitled to nothing more than nominal damages. With respect to the amount awarded by the Supreme Court, the court's calculation was not related to the evidence presented during trial but rather on speculation impermissibly based on fees charged to Capmark by the Corporation.
Even accepting the majority's finding that the plaintiff demonstrated a breach of the subject covenant resulting in an award of nominal damages, given the plaintiff's failure to prove any actual lost profits or an entitlement to reliance damages, in such a circumstance, he is not entitled to recover double attorneys' fees, or, for that matter, any attorneys' fees under the PSA. The plaintiff was not the substantially prevailing party.
"The American Rule provides that 'attorney's fees are incidents of litigation and a prevailing party may not collect them from the loser unless an award is authorized by agreement between the parties, statute or court rule'" (Baker v Health Mgt. Sys., 98 NY2d 80, 88 quoting Hooper Assoc. v AGS Computers, 74 NY2d 487, 491; see Jordan v Benjamin-Beechwood Dune, 178 AD3d at 906). Here, paragraph 10.11 of the PSA provides, "In the event of litigation arising out of this Agreement, the substantially prevailing party shall be entitled to an award of the costs and expenses of such litigation, including two times reasonable attorneys' fees" (emphasis added). At the outset, it is noted that the Supreme Court did not find the plaintiff to be the "substantially prevailing party" but only to be "a prevailing party."
"Ordinarily, only a prevailing party is entitled to attorney's fees" (Nestor v McDowell, 81 NY2d 410, 415; see DKR Mtge. Asset Trust 1 v Rivera, 130 AD3d 774, 776). "To be considered the prevailing party, a party must be successful with respect to the central relief sought" (Fatsis v 360 Clinton Ave. Tenants Corp., 272 AD2d 571, 571; see Nestor v McDowell, 81 NY2d at 415-416; Village of Hempstead v Taliercio, 8 AD3d 476, 476). The determination of whether a party is simply a prevailing party must be based on "'an initial consideration of the true scope of the dispute litigated, followed by a comparison of what was achieved within that scope'" (O'Donnell v JEF Golf Corp., 173 AD3d 1528, 1532, quoting DKR Mtge. Asset Trust 1 v Rivera, 130 AD3d at 776; see Village of Hempstead v Taliercio, 8 AD3d at 476). A fortiori this refers to the damages sought and the damages achieved.
In Nestor v McDowell, the "central relief" the plaintiff sought was a possessory judgment (see Nestor v McDowell, 81 NY2d at 416). Since that relief was denied, she was not the prevailing party (see id.). In O'Donnell v JEF Golf Corp., the plaintiff sought approximately $171,000 in damages for various Labor Law claims (see O'Donnell v JEF Golf Corp., 173 AD3d at 1528). While the Supreme Court found that the defendant did violate Labor Law § 195(d) by failing to provide a wage statement, it was determined that the plaintiff was not the prevailing party since he was awarded only statutory damages of $2,500; the apparent minimum award available (see O'Donnell v JEF Golf Corp., 173 AD3d at 1532). Likewise, in Village of Hempstead v Taliercio, we affirmed the finding that, since the Village was not entitled to the injunctive relief it sought, it could not be the prevailing party (see Village of Hempstead v Taliercio, 8 AD3d at 476). Consistent with New York's standard, in awarding attorneys' fees pursuant to federal statutes, the courts have held that a "'purely technical or de minimis victory' . . . will not qualify a plaintiff as a prevailing party" (B.W. ex rel. K.S. v New York City Dept. of Educ., 716 F Supp 2d 336, 345-346 [SD NY], [*12]quoting Texas State Teachers Assn. v Garland Ind. Sch. Dist., 489 US 782, 792).
Here, the plaintiff sought money damages in a sum equal to the purchase price paid under the PSA, at least $7.5 million, and disgorgement of the moneys paid to the defendant by Springleaf as compensation, $15 million, for a total of at least $22.5 million. The majority attempts to distinguish the foregoing cases addressing the New York view of a "prevailing party." They do so by focusing on the differing causes of action pursued by the plaintiffs in each of those cases and not their relative success achieved in each litigation. That is not the point. Each case similarly holds that one cannot be the prevailing party unless he or she is successful in his or her litigation with respect to realizing the "central relief" which was sought (Fatsis v 360 Clinton Ave. Tenants Corp., 272 AD2d at 571).
The majority cites to Signature Flight Support Corp. v Landow Aviation Ltd. Partnership (730 F Supp 2d 513) for a definition of a prevailing party. Signature Flight applies Virginia law which relies upon the Black's Law Dictionary definition of "prevailing party" as meaning "a party in whose favor a judgment is rendered, regardless of the amount of damages awarded" (Sheets v Castle, 263 Va 407, 413 [emphasis added]; see West Square L.L.C. v Communications Tech., Inc., 274 Va 425, 433). The Virginia approach is wholly inapposite to New York law which applies a result-based standard and will only permit attorneys' fees to the party which realizes the "central relief" it sought. The plaintiff did not do so here.
In any event, Signature Flight is also distinguishable factually. There, the agreement between the parties provided for attorneys' fees to the "substantially prevailing party." The court found that even though the plaintiff did not realize breach of contract damages, it did succeed in obtaining significant declaratory and injunctive relief, dismissal of all but one counterclaim, and dismissal of all affirmative defenses, to support the finding that the plaintiff had substantially prevailed. No such success can be ascribed to the plaintiff herein.
The nominal damages of $1 imposed by the majority does not establish that the plaintiff prevailed so as to trigger his right to any attorneys' fees under the PSA. However, the analysis cannot stop here. Paragraph 10.11 of the PSA entitles the plaintiff to double attorneys' fees only if he is the "substantially" prevailing party. That was the indisputable expectation of the parties. Since New York case law does not view the plaintiff as having prevailed, it is impossible to imagine how it can be held that his nominal damages award was substantial or anything close to it. Indeed, from the clear and unambiguous language of paragraph 10.11, the parties intended redress only for serious harm caused by a breach thereof by the exactment of double attorneys' fees.
Nor can we ignore the use of the word "substantially" in paragraph 10.11 which was intentionally included. "'[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing'" (Vermont Teddy Bear Co. Inc. v 538 Madison Realty Co., 1 NY3d at 475, quoting Reiss v Financial Performance Corp., 97 NY2d 195, 199; see Bailey v Fish & Neave, 8 NY3d at 528; Jordan v Benjamin-Beechwood Dune, 178 AD3d at 905). Where, as here, we are presented with a clear and unambiguous contract negotiated at arm's length and executed by sophisticated counseled business people, we should be "extremely reluctant to interpret" the contract by adding or deleting anything other than what the parties specifically expressed (Rowe v Great Atlantic & Pacific Tea Co. 46 NY2d 62, 72; see Vermont Teddy Bear Co. Inc. v 538 Madison Realty Co., 1 NY3d at 475). Thus, the PSA must be read and enforced according to its express terms (see South Rd. Assoc., LLC v International Bus Machs. Corp., 4 NY3d 272, 277; Greenfield v Phillies Records, 98 NY2d 562, 569; W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162; see also Avialiotis v Continental Broker-Dealer Corp., 30 AD3d 446, 447).
The parties set the bar for realizing an award of double attorneys' fees higher than merely prevailing in an enforcement litigation. Trivial or inconsequential breaches which have no monetary impact on one of the parties are not substantial. Based upon this record, the plaintiff's failure to establish any real, nonspeculative harm, beyond nominal damages, if that, compels the conclusion that the plaintiff was not the substantially prevailing party here, or even the prevailing [*13]party, inasmuch as he was not successful with respect to the central relief he sought (see Nestor v McDowell, 81 NY2d at 415-416; O'Donnell v JEF Golf Corp., 173 AD3d at 1532; Village of Hempstead v Taliercio, 8 AD3d at 476). That being the case, the plaintiff was not the substantially prevailing party and is not entitled to any award of attorneys' fees.
Accordingly, I vote to affirm the determination to deny the defendant's motion for summary judgment dismissing the complaint and on his counterclaim, and to reverse the amended judgment, dismiss the complaint, and, upon so doing, award judgment to the defendant on his counterclaim and remit the matter to the Supreme Court, Nassau County, for a determination on the amount of attorneys' fees owed to the defendant pursuant to the PSA and for the entry of an appropriate second amended judgment in favor of the defendant on his counterclaim thereafter.
ENTER:
Aprilanne Agostino
Clerk of the Court



Footnotes

Footnote 1: It appears that the defendant's alleged competition was not known to the plaintiff until he was participating in discovery in an earlier action commenced by the defendant herein against him to recover moneys due under the PSA which were related to the calculation of the value of the defendant's share of the net working capital of the Corporation as of the closing date (see Meghji v Loughlin, _____ AD3d _____ [Appellate Division Docket No. 2016-09612; decided herewith]). Apparently, the defendant's alleged violation of the covenant not to compete had no impact whatsoever up until that point on the plaintiff's business, business relationships, or income. This action, thus, appears to have been filed in retaliation or response to that earlier litigation.

Footnote 2: At the time of the commencement of this action, the plaintiff had not fully paid his obligations under the PSA. By the time of trial, the purchase price for the defendant's shares in the Corporation, $7.5 million, had been fully paid.

Footnote 3: As the defendant's fourth affirmative defense, the defendant asserted that the "[p]laintiff's obligation to pay [the d]efendant pursuant to the Promissory Note that was part of the [PSA] between the parties was absolute, and [the p]laintiff 'absolutely, unconditionally and irrevocably waive[d] any and all right to assert any defense, setoff, counterclaim or crossclaim of any nature whatsoever' with respect to his obligations to make payments pursuant to the Note." The defendant then alleged that, "pursuant to the parties' express agreement, [the p]laintiff's claim for return of payments made pursuant to the Promissory Note, and for a declaration that [the p]laintiff has no further obligations to [the d]efendant under the [PSA], is expressly barred."

Footnote 4: It is noted that Joint Trial Exhibit 40 is an email sent from the defendant on July 30, 2012, to other Springleaf executives Brad Borchers, Robert Cole, and Donald Breivogel, on which Levine and Anderson were copied, with the subject "Restructuring Group/50m Target." This email discussed setting up a weekly meeting to address issues related to cutting costs which a number of witnesses testified would be a part of the ordinary operations of Springleaf as opposed to a formal restructuring. This is the only email to refer to a "Restructuring Group" and the evidence does not support a claim that the term "restructuring" as used here was indicative of activity which was competitive with Loughlin Management or the Corporation.

Footnote 5: Although not asserted as a defense, one who breaches a contract containing a restrictive covenant cannot later enforce the covenant (see e.g. Cornell v T.V. Development Corp,, 17 NY2d 69, 75; Sussman Educ., Inc. v Gorenstein, 175 AD3d 1188, 1189; Modica v Topaz Enters., Inc., 147 AD3d 1041, 1043; DeCapua v Dine-A-Mate Inc., 292 AD2d 489, 491). As noted in footnote 1, the plaintiff only became aware of the defendant's alleged breach of the covenant not to compete in the defendant's action against him for breach of the payment terms of the PSA.

Footnote 6: "Alvarez" refers to Alvarez & Marsal, North America, LLC (hereinafter A & M), a direct competitor of Loughlin Management/the Corporation, which was retained by Springleaf prior to the hiring of the defendant.